# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cambria County Transit Authority,     :
                Appellant     :
                                   :
           v.                 :    No. 957 C.D. 2019
                                   :    Argued: February 9, 2021
Amalgamated Transit Union, Local 1279     :
                                   :

BEFORE:     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                **HONORABLE PATRICIA A. McCULLOUGH,** Judge (P.)
                **HONORABLE CHRISTINE FIZZANO CANNON,** Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**               **FILED: March 5, 2021**

Cambria County Transit Authority (CamTran) appeals from a July 3, 2019 Order of the Court of Common Pleas of Cambria County (common pleas), which affirmed a grievance arbitration award (Award) by Bernard S. Fabian (Arbitrator) that rescinded the discharge of Eileen Zibura (Zibura) and reinstated her as a bus driver without back pay for the period between her initial suspension through the Award.[1] On appeal, CamTran argues the Award should be vacated for the following

---

[1] The Arbitrator stated the period between Zibura's initial suspension and the time of reinstatement should be considered an "extended suspension for aggressive, hostile and intimidation actions towards a management employee." (Award at 23.) Amalgamated Transit Union, Local 1279 (Union), to which Zibura belongs and is an officer, did not appeal the "extended suspension."

In addition to the grievance involving Zibura's termination, there was a second grievance concerning the procedure used following Zibura's termination that was heard by the Arbitrator. **(Footnote continued on next page…)**

reasons: (1) the Arbitrator incorrectly required CamTran to prove its case using the criminal "beyond a reasonable doubt" standard instead of a lower civil standard; (2) the Award violates what is known as the essence test; (3) the Arbitrator exceeded his authority by altering the discipline once he determined just cause existed; and (4) the Award violates public policy against weapons in the public workplace.[2] In light of the Arbitrator's findings and given the Court's limited review in arbitration appeals, the Court is constrained to affirm.

## I. BACKGROUND

### A. The Incident

The relevant facts as found by the Arbitrator are as follows.[3] Zibura is a 27½-year employee of CamTran and also serves as an officer of Amalgamated Transit Union, Local 1279 (Union). (Award at 3, 14.) On December 9, 2016, Jennifer Gojmerac (Gojmerac), a human resource assistant at CamTran, was in the drivers' lounge area[4] at CamTran's Transit Center, replacing employee rights posters. (*Id.* at 4.) At that time, Zibura entered and "asked [] Gojmerac what she was doing in the [d]river[s'] [r]oom because the [d]river[s'] Room was 'for drivers only.'" (*Id.*) Zibura testified to then picking up and immediately putting back down a 13-inch

---

The Arbitrator dismissed that grievance concerning the procedure, (Award at 11), and the Union did not appeal from that determination. Therefore, discussion related to the second grievance has been omitted.

[2] This final issue is raised in the alternative.

[3] "Under the essence test, the arbitrator's findings of fact are binding on the courts, and the reviewing court may not undertake any independent factual analysis." *Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pa. State Coll. & Univ. Facs.*, 193 A.3d 486, 495 (Pa. Cmwlth. 2018).

[4] The lounge area was described as "a very congested and tight room, not roomy at all." (Award at 3.) It is an 11-foot by 18-foot room, containing a table and three chairs, a microwave that is on a stand, a refrigerator, a small couch that seats two people, a bookshelf, and a bulletin board. (*Id.*)

steel butcher's knife,[5] which had been donated by a now retired driver years ago and stored on or near the microwave. (*Id.* at 13, 17.) However, according to Gojmerac, upon picking up the knife, Zibura asked Gojmerac "do you want to play a game" and motioned as though she might toss the knife to Gojmerac. (*Id.* at 3-4, 13.) Zibura and Gojmerac testified that Zibura referenced going to Torrence State Mental Hospital and needing the knife to protect herself from someone coming out of the ceiling tiles in the restroom. (*Id.* at 18.) Gojmerac testified that after the encounter, she left the room as soon as she finished replacing the posters. (*Id.* at 5, 13.) Just outside the room, Gojmerac's supervisor, Human Resource Manager (HR Manager), was talking to another employee who worked at a kiosk. (*Id.* at 4.) Neither the HR Manager nor kiosk employee heard any of the interaction between Zibura and Gojmerac. (*Id.* at 16.) Nor did two drivers who were in the lounge at the time, one of whom was the Union President, hear this interaction. (*Id.* at 4-5, 13.)

When Gojmerac left the room and met with HR Manager at the kiosk, Gojmerac did not indicate anything was wrong. (*Id.*) Gojmerac did not report what happened to HR Manager until she returned to HR Manager's car, at which time she started to cry and stated that she felt threatened. (*Id.* at 5, 16.) Upon return to CamTran's General Offices, Gojmerac and HR Manager met with Safety Director and Executive Director, and an investigation commenced. (*Id.* at 5.) By that time, Zibura had finished her shift for the day and left; she was not scheduled to work again until Monday, December 12, 2016. (*Id.*)

As part of the investigation, CamTran interviewed the Union President and the other driver who were in the lounge at the time of the alleged incident, both of whom stated they were conversing among themselves and did not hear or observe

---

[5] The knife measures 13 inches from the end of the wooden handle to the tip of the blade.

anything abnormal. (*Id.* at 4-5, 13.) At approximately 9:00 a.m. on the following Monday, Zibura was asked to report to the main office to speak with the Executive Director. (*Id.* at 6.) At the time, Zibura had worked two-and-one-half hours and completed at least one of her scheduled bus runs. (*Id.* at 5-6.) At the meeting, Zibura stated she moved the knife but did not intend to threaten or harm Gojmerac. (*Id.* at 6.) Zibura was suspended pending further investigation. (*Id.*)

On December 20, 2016, Executive Director and others met with Zibura and representatives of the Union. (*Id.*) At the meeting, Zibura presented a grievance related to her discipline.[6] (*Id.* at 6.) At the conclusion of the meeting, Executive Director advised Zibura that she was being terminated. (*Id.*) In a termination letter dated the same date, CamTran provided three reasons for Zibura's discharge:

1. You directed verbal hostility toward a management employee by entering the room and asking what she was doing in "their" room and why she came out of her "cubby hole," creating an unwelcome atmosphere.

2. You were in possession of a knife on [CamTran] Property, endangering the safety of all employees. You intimidated and threatened an employee of CamTran, [] Gojmerac, by asking her if she wanted to "play a game," picking up a knife, and holding the point toward her, motioning to throw the knife at her at one point, and not putting the knife down after asked.

3. You disregarded [Gojmerac]'s attempts to de-escalate the situation by continuing to hold the knife and moved your arm toward her as to throw/toss the knife at her. Even though you did not throw/toss the knife, it created a significantly unsafe and intimidating work environment.

(*Id.* at 15 (quoting Reproduced Record (R.R.) at 512C[7]).)

---

[6] The original grievance was unsigned, but a signed version was subsequently submitted.

[7] Although Rule 2173 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2173, requires the reproduced record to be numbered in Arabic figures followed by a small "a," the three **(Footnote continued on next page…)**

4

Zibura's grievance proceeded through the process established by the collective bargaining agreement (CBA) between CamTran and the Union, and ultimately an arbitration hearing was held on May 4, 2017. Gojmerac, HR Manager, Executive Director, and Safety Director testified on behalf of CamTran, as did the Union President as if on cross-examination. A retired bus driver, the kiosk employee, Union President, the other driver who was present in the lounge during the alleged incident, and Zibura testified on behalf of the Union. Executive Director was recalled by CamTran to provide rebuttal testimony. Aside from the alleged incident and subsequent events related thereto, the witnesses described what the Arbitrator called a "pattern of escalating behavior against the [m]anagement of [CamTran]," which began with the removal of a water cooler from the lounge, an action Zibura claimed was in retaliation against her and the Union; an unfair labor practice charge before the Pennsylvania Labor Relations Board resulting from the water cooler's removal; and the display of a 15-foot-high camel with a sign asking "where's the water," which was parked in a prominent area downtown. (Award at 12.)

### B.    The Award

Based upon the evidence presented and the parties' post-hearing briefs, the Arbitrator issued the Award on July 31, 2017. The Arbitrator framed the issue as whether just cause existed for Zibura's termination, and, if not, what is the remedy. (*Id.* at 7.) The Arbitrator reviewed the relevant provisions of the parties' CBA, beginning with the Management Rights provision in Article II, Section 9, upon which CamTran relied. It provides:

volumes of the Reproduced Record, while numbered sequentially, utilize the suffix "A," "B," or "C," depending on the respective volume.

The Union fully recognizes the right of [CamTran] to determine its policies and procedures to conduct, manage and control the operations of its business in light of past experiences and sound business judgment; to determine the qualifications for and select its managerial and supervisory forces; to determine the qualifications for and select employees for promotion within the bargaining unit based on management's sole discretion of those best qualified; to determine the number of employees it will retain in its service at any time; to determine the number and qualifications of employees needed on any shift or to create, modify or discontinue jobs; determine the type, kind, make, size and amount of equipment will be operated and used by [CamTran,] including when, where and how such equipment will be operated and used by [CamTran]; to establish rules and regulations necessary for the safe, proper and sound conduct of [CamTran] business and where deemed appropriate by [CamTran].

Except as specifically limited by this Agreement, it is not the intention of this Agreement and the same shall not be construed so as to limit in any way the right of [CamTran] to manage and operate its business.

(*Id.* (quoting CBA, Art. II, § 9, R.R. at 430C).)

The Arbitrator also examined Article III, Section 2 dealing with "Discipline and Hearings," which provides, in relevant part, that "[a]n employee shall not be disciplined or dismissed from service, nor shall entries be made against [the employee's] record without Just Cause." (Award at 8 (quoting CBA, Art. III, § 2, R.R. at 432C).) The provision further provides that CamTran "agrees that in most instances discipline for Just Cause shall be administered as progressive discipline." (*Id.*) The Arbitrator further reviewed CamTran's Personnel Policies and Procedures, which provides, in pertinent part, as follows:

7. Possession [o]f Any Weapon While [o]n [CamTran] Property: A "weapon" is defined as any instrument that is not used for its intended purpose or an implement of crime that could result in serious bodily injury or endangers the safety of employees or the public.
    First Offense – Discharge.

6

(*Id.* at 9 (quoting R.R. at 488C).)

The Arbitrator next determined the applicable burden of proof. Looking at Elkori and Elkori's legal treatise, "How Arbitration Works," and based upon his own prior decisions and experience, the Arbitrator determined that "it is generally held by most arbitrators that for discharge, the standard of proof is beyond a reasonable doubt" because "discharge is industrial capital punishment." (Award at 13-14.) The Arbitrator explained that discharge "follows the employee as [the employee] attempt[s] to secure future employment as well as possibly reflected in credit rating or other similar problems." (*Id.* at 14.) By contrast, "for lesser discipline, the standard of preponderance of evidence is used to support [m]anagement's burden of proof." (*Id.*)

With these standards in mind, the Arbitrator turned to the merits of the grievance and the specific reasons that CamTran provided for Zibura's discharge. Because HR Manager, the kiosk employee, the Union President, and the other driver in the lounge testified they did not hear or see any of the alleged incident, the Arbitrator stated there was "no direct evidence or witnesses that Zibura was threatening any physical harm"; instead, the Arbitrator continued, "[a]ll that is known is the statement of Gojmerac and Zibura on this issue." (Award at 16.) The Arbitrator noted that Zibura admitted to talking and joking with Gojmerac and picking up the knife, which she claimed to immediately put back down. (*Id.*) The Arbitrator questioned why Gojmerac did not try to get the attention of the Union President or the other driver present in the lounge or HR Manager who was just outside if she felt physically threatened. (*Id.* at 17.) With regard to the knife, the Arbitrator stated:

> This knife being in the room for such a significant period of time undermines the allegations made with regard to the violation of the

7

policy and procedure concerning employees or others utilizing a knife on [CamTran] property. The knife was already on [CamTran] property as it had been for a significant number of years. [] Zibura did state that she did physically pick up the knife, although she denies that she made any threats or gestures with the knife and that she immediately put the knife down. We have no witnesses to confirm or deny the statements of either [p]arty in this situation.

[] Zibura also admits, which confirms the testimony of [] Gojmerac that she did make reference to going to Torrence State Mental Hospital; and, also that she may have use for the knife when she went to the restroom for defense in that somebody may be coming after her down through the ceiling tiles.

(*Id.* at 17-18.)

The Arbitrator found Zibura's "aberrant behavior and statement . . . w[ere] intended to intimidate junior employee Gojmerac," who was a member of management. (*Id.* at 18.) Thus, the Arbitrator found CamTran had proved the claim of verbal hostility towards management but that it did not rise to the level of requiring discharge. (*Id.*) The Arbitrator explained that "[t]he purpose of discipline generally speaking is to correct unwanted behavior in an employee," which "is the foundational basis and belief for the concept of progressive discipline." (*Id.*) The Arbitrator reasoned that "there are times when there [is] such egregious behavior exhibited or threats of life occur, or safety of others occur," which warrants immediate discharge, but the Arbitrator "d[id] not believe that what happened with the verbal exchange between these two employees rises to such a level." (*Id.* at 18-19.) Although the Arbitrator found CamTran did not satisfy its burden beyond a reasonable doubt as to the verbal hostility claim, which would warrant discharge, the Arbitrator found Employer did prove the claim by a preponderance of the evidence, which would support some form of discipline. (*Id.* at 19.)

8

The Arbitrator rejected CamTran's argument that the Arbitrator could not modify the discipline, explaining that the CBA did not contain such express limiting language. (*Id.*) The Arbitrator explained:

> If I w[as] to agree with the argument proposed by [CamTran], I would have no opportunity to impose a lesser discipline, if the required burden of proof was not met. I would have to rescind the discharge and put [Zibura] back to work with full pay and benefits. I do not believe that this was ever the intent of the negotiators of this [CBA]. If it was their intent, it is not reflected in the language of same as currently written.

(*Id.* at 20.)

As to the second basis for discharge, possession of a weapon on CamTran property, the Arbitrator reasoned that "[t]he only reason that [Zibura] was in possession of a knife on [CamTran] [p]roperty was that the knife had been on [CamTran] [p]roperty for a significant period [of] time measured in years." (*Id.*) Because Zibura's testimony and Gojmerac's testimony differed as to what actually happened involving the knife, and there were no witnesses, the Arbitrator found he could not hold that CamTran satisfied its burden on this claim beyond a reasonable doubt. (*Id.*) However, the Arbitrator found, based upon the testimony of Zibura and Gojmerac, that, "at one time or another[,] Zibura did pick up the knife even for a short period of time," which was proven by a preponderance of the evidence. (*Id.* at 20-21.)

Turning to the third basis for discharge, related to ignoring Gojmerac's attempts to deescalate the situation, the Arbitrator found there was not "enough evidence for [the] 'beyond a reasonable doubt' standard to support a discharge" on this basis. (*Id.* at 21.) The Arbitrator again stated that had Gojmerac feared for her life, she could have gained the attention of any one of the individuals nearby without difficulty. (*Id.*) The Arbitrator also found that Gojmerac could have immediately

9

told the HR Manager about the incident but did not do so until they returned to the HR Manager's vehicle. (*Id.*) The Arbitrator stated:

> It is not my intention to try and minimize the situation that [] Gojmerac found herself in the driver[s'] room. However, I do not believe that it was Zibura's intention to actually do her physical harm. If she actually believed that it was Zibura's intention to do her physical harm, her reaction at the time was not appropriate to the danger that she believed herself to be in.

(*Id.* at 21-22.)

The Arbitrator concluded CamTran did not meet its burden of proving, beyond a reasonable doubt, that Zibura's actions supported termination. The Arbitrator, however, did find "Zibura has fostered an atmosphere of hostility against members of management that historically appears to be escalating," and the purpose of discipline is "to try and stop this escalation of unwanted behavior." (*Id.* at 22.) Although the Arbitrator set aside the discharge on the basis of insufficient evidence, the Arbitrator found "there [wa]s enough evidence, especially when viewed from a historical perspective[,] to support discipline for [] Zibura." (*Id.*) The Arbitrator stated: "I believe that it was her intention to intimidate the junior employee who was new to [CamTran] and to try and escalate the situation. Her statements and handling of the knife, even if [] not meant to threaten the employee, were[, at] a minimum[,] meant to intimidate the employee." (*Id.*)

Accordingly, the Arbitrator granted the grievance to the extent the Arbitrator rescinded Zibura's termination and ordered Zibura reinstated with full seniority and benefits. (*Id.* at 23.) However, the Arbitrator ordered that the period between Zibura's initial suspension to the time of her reinstatement to be considered as "an extended suspension for aggressive, hostile and intimidat[ing] actions towards a management employee." (*Id.*) No monetary award was made to Zibura.

10

### C.     Common Pleas' Opinion and Order

Following the Award, CamTran filed a petition for review in common pleas. By Order dated July 3, 2019, common pleas affirmed the Arbitrator's Award, concluding, in relevant part, that the Arbitrator did not err by using the beyond a reasonable doubt standard, the Award rationally flows from the CBA, and the Award did not violate public policy.[8]  In an opinion supporting the Order, common pleas rejected CamTran's argument that the Arbitrator utilized the incorrect standard for its burden of proof, explaining that this Court previously affirmed another arbitrator's award in which the beyond a reasonable doubt standard was applied. (Common pleas' Opinion (Op.) at 5 (citing *Franklin Reg'l Sch. Dist. v. Franklin Reg'l Educ. Ass'n* (Pa. Cmwlth., Nos. 114 C.D. 2015, 147 C.D. 2015, filed Jan. 7, 2016), slip op. at 10-11).[9])  Common pleas next found that the Arbitrator's Award was rationally derived from the CBA, thereby satisfying the second prong of the essence test.[10]  (Common pleas Op. at 6.)  In so doing, common pleas stated that "[w]hile [it] may see a different conclusion under a better defined weapon[]s policy . . . given the[] facts of the case and the CBA," the Arbitrator's Award could rationally derive from CamTran's weapons policy.  (*Id.* at 11.)

Although the Arbitrator found Zibura did not possess a weapon, common pleas stated CamTran "met its burden to establish Zibura violated CamTran's directing verbal hostility policy." (*Id.* at 11.)  However, common pleas determined

---

[8] Common pleas also found that the record did not support retaliation and the Arbitrator did not err in awarding fees against CamTran.  Those issues are not before this Court.

[9] Unreported panel decisions of this Court may be cited for their persuasive value pursuant to Rule 126(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b)(1), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

[10] Common pleas found that there was no dispute that the first prong of the essence test was satisfied as the issue is properly defined within the terms of the CBA. (Common pleas Op. at 6.)

11

that the Arbitrator's decision to suspend rather than terminate Zibura flowed rationally from the CBA's progressive discipline policy. (*Id.*)

Next, common pleas rejected CamTran's argument that the Award violated the core function test or was manifestly unreasonable, noting that the Supreme Court has rejected those exceptions to the essence test. (*Id.* at 12.) Finally, common pleas found that the Award did not violate public policy. Common pleas explained:

> the remedy ordered by the Arbitrator is to reinstate Zibura's employment and for her to be placed on the schedule and all benefits to be restored. Complying with this remedy does not require CamTran to undermine any implicated public policy and it does not cause CamTran to breach any lawful obligation or public duty. The remedy merely requires CamTran to reinstate Zibura back on the schedule with full seniority and benefits.

(*Id.* at 14.) Accordingly, common pleas affirmed the Award.[11] CamTran now appeals to this Court.

## II.     PARTIES' ARGUMENTS

On appeal, CamTran argues several bases for vacating the Award and reinstating the termination of Zibura. First, it argues the Arbitrator applied the incorrect burden of proof standard. It argues that because this is a civil matter, the preponderance of the evidence standard, not the beyond a reasonable doubt standard that is usually applied in criminal cases, should apply. At most, CamTran contends it should have been a clear and convincing evidence standard. Second, CamTran argues that the Award is not rationally derived from the CBA. CamTran asserts it has a zero tolerance policy with regard to weapons and discharge is appropriate for

---

[11] Following the Order, CamTran filed a Petition for Stay of Proceedings and Supersedeas, which common pleas granted. (Record Item 22.)

a first offense of violating that policy. By ignoring its zero tolerance policy, CamTran argues the Arbitrator did not abide by the essence of the CBA. CamTran also argues that the Arbitrator's modification of discipline from termination to suspension was inconsistent with the CBA and therefore violated the essence test. Once the Arbitrator found just cause existed, CamTran argues the Arbitrator should have deferred to CamTran's decision to discipline Zibura. According to CamTran, the management rights provision in the CBA reserves discipline to CamTran. Finally, CamTran argues, in the alternative, that the Award violates public policy. It argues that allowing weapons in the public sector violates the core function of safety. CamTran asks the Court to reverse common pleas and vacate the Award.

The Union responds as follows. First, it was not error for the Arbitrator to apply a beyond a reasonable doubt standard as the CBA does not specify what standard does apply. Therefore, it was reasonable for the Arbitrator to rely on a treatise to interpret the CBA. Next the Union argues that the Award does satisfy the essence test. The Union states that there is no dispute that the first prong of the essence test is met, as whether there was just cause to terminate is within the scope of the CBA. Rather, the Union contends it is the second prong, whether the Award is rationally derived from the CBA, at issue, and the Union asserts that prong is also satisfied. The Union argues the Arbitrator considered CamTran's argument about the management rights provision limiting the ability to modify discipline in arbitration and determined no such limiting language existed. The Union argues the Arbitrator examined the three bases CamTran provided for termination and found CamTran sustained its burden of proof only as to the verbal hostility allegation, which was not sufficient to justify termination. According to the Union, CamTran is asking the Court to exceed its narrow scope of review. In addition, the Union

13

asserts CamTran is relying on the core functions test, which has been rejected by the Supreme Court in favor of the public policy exception. That exception, the Union contends, is not implicated here because public policy will not be undermined because the only finding made involved verbal hostility, not the weapons policy, as CamTran asserts.

In its reply brief, CamTran reiterates that the preponderance of the evidence standard is the appropriate standard in civil matters. CamTran further asserts that regardless of which standard applies, CamTran met its burden and the Arbitrator improperly substituted his judgment as to discipline for CamTran's judgment.

## III. DISCUSSION

### A. *Burden of Proof Standard*

We begin with CamTran's argument that the Arbitrator erred in utilizing the beyond a reasonable doubt standard instead of the preponderance of the evidence standard when determining whether CamTran satisfied its burden of proof. In choosing the beyond a reasonable doubt standard, the Arbitrator consulted a legal treatise on arbitration, "How Arbitration Works," and concluded that, given the severity of discharge, this heightened standard was appropriate. Pennsylvania courts have previously relied upon the same treatise in a number of their own cases. *See, e.g.*, *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n, PSEA/NEA*, 754 A.2d 1255, 1260 n.2 (Pa. 2000); *Allegheny Valley Sch. Dist. v. Allegheny Valley Educ. Ass'n*, 943 A.2d 1021, 1025 (Pa. Cmwlth. 2008); *United Sch. Dist. v. United Educ. Ass'n*, 782 A.2d 40, 45 (Pa. Cmwlth. 2001); *City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Comm.* (Pa. Cmwlth., No. 848 C.D. 2019, filed Nov. 9, 2020), slip op. at 12. In fact, this Court previously relied upon the same treatise in

14

determining that an arbitrator has some discretion in choosing the applicable standard. *Franklin Regional*, slip op. at 10-11.

Here, CamTran does not argue that the CBA specifically sets out the burden of proof to be applied. In his opinion, the Arbitrator thoroughly explained his reasoning for applying the heightened standard. In addition to this standard being commonly used by arbitrators, the Arbitrator specified that its application here was warranted for two reasons. First, the Arbitrator explained the "discharge is industrial capital punishment" that has far-reaching impacts on the discharged employee beyond the employment context. (Award at 14.) Second, the Arbitrator stated that because Zibura is a 27½-year employee, who also is an active Union member and a past and present Union officer, a heightened standard should apply to her termination. Given the above, we find no error in the Arbitrator's use of the beyond a reasonable doubt standard of proof. If the parties intended for a different standard to apply, they could have bargained for and specifically included that standard in their CBA. As there is no evidence that they did so here, the Arbitrator had discretion to choose the standard.

### B. Essence Test[12]

In reviewing challenges to grievance arbitration awards, the Court applies the deferential essence test. *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 862-63 (Pa. 2007) (*Westmoreland I*). The essence test is a two-prong analysis: "first, the court must determine if the issue is properly defined as within the terms of the CBA and second, if the issue is embraced in the [CBA], whether the

---

[12] CamTran's second and third arguments have been combined as both implicate whether the Award violates the essence test.

15

award is rationally derived from the [CBA]." *Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pa. State Coll. & Univ. Facs.*, 193 A.3d 486, 494-95 (Pa. Cmwlth. 2018) (citation omitted). Here, there is no dispute that the first prong is met, as the issue of whether just cause existed to terminate Zibura was properly defined as falling within the scope of the CBA. The parties disagree about whether the second prong of the essence test is met. Under this prong, an award may only be vacated if the award "'indisputably and genuinely is without foundation in, or fails to logically flow from,' the CBA." *Phila. Housing Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 33*, 52 A.3d 1117, 1121 (Pa. 2012) (quoting *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999)). Because of the deference given arbitration awards, the Court cannot second-guess an arbitrator's findings of fact, which are binding on the Court. *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n, Pa. State Educ. Ass'n*, 978 A.2d 413, 415 n.2 (Pa. Cmwlth. 2009). Nor may the Court undertake any independent factual analysis. *Lock Haven*, 193 A.3d at 494. "In addition, a court may not review the merits or reasonableness of the arbitrator's award under the guise of the essence test." *Id.* at 495.

CamTran's argument that the Award does not logically flow from the CBA is two-fold. First, CamTran argues the CBA provides CamTran with the authority to determine its policies and establish rules related to safety, which CamTran did by enacting a zero-tolerance policy involving the possession of weapons, which the Arbitrator did not follow. Second, it argues the Arbitrator could not impose a lesser discipline for a violation of the weapons policy, as such a right is reserved to management. However, CamTran's arguments are premised upon a finding that Zibura violated the weapons policy, which the Arbitrator **did not make**. The only

16

basis on which the Arbitrator found CamTran met its burden of proof was related to Zibura directing verbal hostility towards a member of management. The Arbitrator found that the infraction of directing verbal hostility toward management did not warrant dismissal but did warrant the imposition of discipline. Because the CBA provides that CamTran "agrees that in most instances discipline for Just Cause shall be administered as progressive discipline," (CBA, Art. III, § 2, R.R. at 432C), we cannot say that the Arbitrator's Award "'indisputably and genuinely is without foundation in, or fails to logically flow from,' the CBA." *Phila. Housing Auth.,* 52 A.3d at 1121 (quoting *Cheyney Univ.*, 743 A.2d at 413).

The Court is also not persuaded by CamTran's argument that the CBA reserves decisions related to discipline stemming from a violation of the weapons policy solely to CamTran. For support, CamTran cited *County of Centre v. Musser*, 548 A.2d 1194 (Pa. 1988), and *Board of Education of the School District of Philadelphia v. Philadelphia Federation of Teachers*, 610 A.2d 506 (Pa. Cmwlth. 1992). However, in both of those cases, the applicable CBA expressly reserved the right of discipline to the employer. *See Musser*, 548 A.2d at 1196 (quoting the CBA, which provided "[t]he sole right to discipline and discharge employees for just cause is retained by the County") (emphasis omitted); *Phila. Fed'n of Teachers*, 610 A.2d at 508 (explaining the CBA provides "the arbitrator shall have no power or authority to make any decision contrary to or inconsistent with the terms of the [CBA]"). In *Upper Merion Area School District v. Teamsters Local #384*, 165 A.3d 56, 66 (Pa. Cmwlth. 2017), the CBA provided that the employer "shall have the right to discipline or discharge any employee for just cause or for violation of this [a]greement." Despite this language, we held, based upon our precedent, "that in the absence of a clear limitation in the CBA, it is within the arbitrator's authority to

17

modify the discipline imposed by" an employer. *Id.* We stated that "where the agreement does not specifically define or designate the discipline to be imposed, and does not specifically state that the employer is the one with sole discretion to determine discipline, the arbitrator is within his or her authority to modify the discipline imposed." *Id.* (citation omitted). Moreover, we have recognized that "an arbitrator may fashion a remedy in a particular case that is not explicitly prescribed in the CBA so long as the remedy furthers the essence of the CBA." *Lock Haven*, 193 A.3d at 495. Based on this precedent, the Arbitrator could find that the CBA here does not expressly reserve the right to discipline to CamTran. Accordingly, we cannot say that the Arbitrator's decision to reduce the discipline from termination to a long-term suspension does not rationally derive from the CBA, which provides for progressive discipline, especially where there was no finding of a violation of the weapons policy and in light of the Arbitrator's finding that Zibura directed verbal hostility towards management.

### C. *Public Policy Exception*

Alternatively, CamTran argues that the Award violates public policy. In cases where a court finds that the essence test is satisfied, the court may then consider whether the award violates a well-defined and dominant public policy of the Commonwealth. *Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1007-08 (Pa. 2019). The public policy exception is a narrow exception and prohibits a court from enforcing an arbitrator's award that contravenes public policy. *Id.*; *Shamokin Area Sch. Dist. v. Am. Fed'n of State, Cnty., and Mun. Emps. Dist. Council 86*, 20 A.3d 579, 582 (Pa. Cmwlth. 2011). The public policy exception requires the application of a three-prong test:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." . . . . Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011) (quoting *Westmoreland I*, 939 A.2d at 866). "The burden of establishing a violation of public policy rests on the party asserting the public policy exception." *Lock Haven*, 193 A.3d at 498. Whether the exception applies is a question of law and our standard of review is de novo, and our scope of review is plenary. *Id.*

CamTran argues the public policy implicated here "is allowing weapons in public sector areas wh[ich] have a core safety function with zero ability of an employer to mete out discipline." (CamTran's Brief at 29-30.) CamTran argues that because "safety to the public and employees is paramount[,] weapons are not tolerated by employees or passengers." (*Id.* at 31.) According to CamTran, "Zibura's actions strike at the heart of such a function and concluding otherwise jeopardizes CamTran's general function." (*Id.*) Therefore, CamTran asserts "[i]t is essential that CamTran be able to interpret rules, including defining a weapon, in order to carry out this core function." (*Id.*) We understand and appreciate CamTran's arguments regarding public and employee safety. However, we see no provision in the CBA that would remove the interpretation and application of CamTran's weapons policy from the scope of arbitration. The Arbitrator has interpreted the weapons policy and found that CamTran did not sustain its burden

19

related to a violation of that policy. Therefore, this incident cannot serve as the foundation for applying the public policy exception.

## IV.  CONCLUSION

While Zibura's conduct was "aberrant" as the Arbitrator found, (Award at 18), because this Court is bound by the Arbitrator's factual findings and is limited by a narrow scope of review, we are constrained to affirm common pleas' Order, affirming the Arbitrator's Award.

_____

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cambria County Transit Authority,       :
                  Appellant       :
                                     :
          v.              :    No. 957 C.D. 2019
                                       :
Amalgamated Transit Union, Local 1279    :
                                     :

# **O R D E R**

NOW, March 5, 2021, the Order of the Court of Common Pleas of Cambria County, dated July 3, 2019, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge