651 A.2d 1152

The SCHOOL DISTRICT OF PHILADELPHIA and the Board of Education, Appellant,

v.

PHILADELPHIA FEDERATION OF TEACHERS, Local 3, American Federation of Teachers, AFL–CIO.

Commonwealth Court of Pennsylvania.

Argued Oct. 6, 1994.

Decided Dec. 1, 1994.

Reargument Denied Feb. 6, 1995.

672

Vincent J. Salandria, Asst. General Counsel, for appellants.

Ralph J. Teti, for appellees.

Before SMITH and NEWMAN, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

The School District of Philadelphia and the Board of Education (collectively, the District) appeal from the March 21, 1994 order of the Court of Common Pleas of Philadelphia County denying the District's petition for review to set aside the August 6, 1993 award of Arbitrator Stanley L. Aiges, prohibiting the District from changing the content of certain jobs.

In a prior dispute between the parties involving the interpretation of the same provision of the parties' collective bargaining agreement (Agreement), Arbitrator Aiges, relying upon previous arbitration decisions, held that past practice cannot contravene the District's unilateral power under the Agreement to change the content of jobs. The question before us, therefore, is whether the arbitrator's award in this case, holding that the District violated binding past practice in changing the content of certain jobs, was a proper exercise of the arbitrator's authority under the Agreement.[1]

Our scope of review of an arbitrator's decision is limited to determining whether the arbitrator's award draws its essence from the collective bargaining agreement. *Midland Borough School District v. Midland Education Association, PSEA*, 532 Pa. 530, 616 A.2d 633 (1992). "[T]he 'essence test' also dictates that judicial review of an arbitration award must focus on the question of whether the *award* represented a *legitimate, reasonable interpretation of the collective bargaining agreement.*" *Id.* at 541, 616 A.2d at 638–39. We conclude that the arbitrator's award in this case, which contradicts his prior decision and those upon which he relied,

1. We note that the Federation has raised no challenge to the economic justification for the District's actions nor any allegation of a violation of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101—27–2702.

involving the same parties, the same controlling issue, and the same or substantially the same clauses of the Agreement, does not represent a legitimate, reasonable interpretation of the Agreement.

## Background

This suit arises from the District's efforts to reorganize the school system in order to reduce expenses. The issue, decided by the arbitrator, is whether the District has the right to assign additional duties to four job classifications: librarians, language skill teachers, department heads, and trade coordinators. Under the District's reorganization plan, librarians and language skill teachers were required to provide regularly scheduled coverage of classrooms in elementary schools when classroom teachers were provided "prep" time. Additionally, certain department heads and trade coordinators in secondary schools were assigned to teach an additional class each day.

The Philadelphia Federation of Teachers, Local 3, American Federation of Teachers, AFL–CIO (collectively, the Federation) filed a grievance arguing that these changes violated Article B–II, Section 1a of the Agreement, which provides:

> The Board and its representatives and the Federation and its representatives shall take no action violative of, or inconsistent with, any provision of this Agreement or any policy or practice governing working conditions of employees existing on the date of the execution of this Agreement. . . .

(Article B–II, RECOGNITION, Section 1a, R.R. at 18a.) The District responded that, as recognized in the prior arbitration decisions, "Reorganization I"[2] and "Reorganization II,"[3] the District was acting within its rights under Articles B–I and B–XIII of the Agreement, which provide:

---

**2.** (Decision of Arbitrator M. Benewitz, August 2, 1991, R.R. at 1276a–1332a.)

**3.** (Decision of Arbitrator S. Aiges, March 9, 1993, R.R. at 1385a–1416a.)

The parties recognize that the Board of Education has unilateral authority in the field of educational policy and development. . . .

(Article B–I, PURPOSE AND SCOPE, R.R. at 18a.)

[I]t is the purpose of this Agreement to preserve the complete authority of the Board to take action not inconsistent with any provision of this Agreement in respect of the policies and administration of the school system which it exercises under the provisions of law. . . .

(Article B–XIII, CONCLUSION, R.R. at 18a.) Thus, according to the District, the arbitrator violated Article B–VIII of the Agreement, which provides:

[an arbitrator] shall be without power or authority to make any decision:

Contrary to, or inconsistent with or which modifies or varies in any way the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law. . . .

(Article B–VIII, Section 2, Step 3c(i), R.R. at 18a.)

The arbitrator granted the Federation's request to order the District to cease and desist implementing its reorganization plan. At the outset, the arbitrator apparently distinguished the two prior "Reorganization" decisions involving these parties on the ground that the prior cases involved the District's right to layoff employees, whereas, this case involves the narrower issue of the District's authority to assign additional duties to four job classifications. Opining that not every dispute lends itself to a decision based upon the raw text of the agreement, the arbitrator determined that past practice is relevant to the resolution of this dispute. The arbitrator defined binding past practice as a consensual, clear course of conduct that is consistent and continuing over an extended period of time. The arbitrator then concluded that the above changes sought by the District violated binding past practice.[4]

---

4. With respect to past practice, the arbitrator found the following. In 1974, the parties reached an enforceable accord to exclude librarians and language skill teachers from covering "prep" time, an agreement

On appeal, the trial court denied the District's petition for review, concluding that the arbitrator's decision drew its essence from the Agreement.

Before this Court, the District asserts that the arbitrator's decision is so manifestly irrational, that it cannot have drawn its essence from the Agreement. The thrust of the District's argument is that the arbitrator irrationally failed to follow prior arbitration decisions, particularly the arbitrator's own decision of Reorganization II, which the District characterizes as holding that past practices cannot bar the District from exercising its unilateral authority under the Agreement to change the content of jobs.

which has been consistently reflected in the parties' practice since that time. Specifically, the arbitrator found that on September 1, 1974, the parties adopted Article T–XIII, which provided 225 minutes of preparation time each week to elementary school teachers. Meetings ensued to address the coverage of the classes by other employees during "prep" time. As a result of these meetings, on February 21, 1974, Associate Superintendent of Schools for Field Operations, C.A. Highsmith, issued a memorandum (Highsmith memorandum) which provided, "Librarians . . . may not be used to provide preparation time for teachers. . . ." (August 6, 1993 decision of Arbitrator Aiges at 6, R.R. at 26a.) On April 18, 1974, Highsmith amended his memorandum to also exclude language skill teachers from "prep" time coverage. Linda Harris, Philadelphia Federation of Teachers Grievance/Arbitration Representative, testified that the Highsmith memorandum reflected the parties' agreement on the subject. Harris also testified that, in accordance with the agreement, from September 1974 to September 1992, librarians and language skill teachers were not scheduled to cover "prep" time. According to Harris, librarians and language skill teachers covered "prep" time only in the unexpected absence of a scheduled employee. Therefore, the arbitrator determined that the District violated binding past practice by assigning the librarians and language skill teachers to cover "prep" time.

With respect to the teaching duties of department heads and trade coordinators, the arbitrator found that they have not been required to teach more than one class a day for at least twenty years. Specifically, the arbitrator found that in a May 17, 1973 memorandum, Highsmith sought to increase the teaching load of department heads and trade coordinators. The District's Hearing Examiner and Director of Grievances held that this action violated the Agreement, which prohibits unilateral changes in the teaching assignment of the affected employees. In 1988, the District, again, sought unsuccessfully to increase the teaching load of department heads in negotiations, but failed to obtain the Federation's accord. Therefore, the arbitrator determined that the District violated binding past practice by increasing the teaching load of department heads and trade coordinators.

The Federation argues that the Agreement expressly prohibits the District from violating past practice. Therefore, according to the Federation, the arbitrator's award, ordering the District to cease its violation of past practice, is drawn from the essence of the Agreement. The Federation also argues that the arbitrator is not bound by his prior decisions, and, in any event, the Federation argues that the arbitrator distinguished the prior cases, involving layoffs, from the present case, involving changes in job content.

## Discussion

As emphasized by our Supreme Court in *Midland*, "[a]lthough traditionally a great deal of deference is to be given to decisions of arbitrators, courts nonetheless have the obligation to review those decisions when properly called upon to do so." *Midland*, 532 Pa. at 536, 616 A.2d at 636. In this case, we are called upon to review the award of an arbitrator that contradicts previous arbitration awards, including his own, involving the same parties, the same controlling issue, and the interpretation of the same or substantially the same provisions of the Agreement.

To understand the question presented, we must review the prior arbitration decisions cited. Contrary to the arbitrator's characterization of these decisions as solely involving layoffs, our reading of these decisions reveals that the District's authority to change the content of certain jobs pursuant to the same or substantially similar provisions was clearly at issue.

The first relevant decision, preceding Reorganization I, is the 1978 opinion of Arbitrator Dash (Dash decision) [5] in which Arbitrator Dash permitted the District to make certain changes in the staffing assignments of administrators. The dispute in the Dash decision arose under the then existing Article I–B, Section 2, which provided, "that the Board of Education has sole authority and final responsibility in the field of educational policy and development" and Article II–P, Section 1, which provided that neither party shall take any

5. (Decision of Arbitrator G. Allan Dash, Jr. June 14, 1978, R.R. at 1070a–1105a.)

"action violative of, or inconsistent with, any provision of this Agreement or any policy or practice governing working conditions of Administrators existing on the effective date of this Agreement." (R.R. at 1097a–99a.)

In Reorganization I, which involved the District's authority to make changes in certain job assignments pursuant to Article B–I, Arbitrator Benewitz held the following:

> As other arbitrators have ruled, the instant arbitrator finds that prior practice could not prevent changes in the content of jobs. . . . Nothing in the contract [protects job content] explicitly, and changes in job content lie at the heart of the board's powers over educational policy and development. This power is superior to the classification and wage provisions of the agreement. When a change is deemed necessary for educational policy reason—Article I of the contract and the law allow such changes be made.

(R.R. at 1324a.)

> In Reorganization II, Arbitrator Aiges stated:

> To begin with, arbitrators are not really bound by the legal principle of *stare decisis*. They are under no obligation to conform to rulings issued by other arbitrators. This is especially true as regards cited cases which involve other parties, other clauses, other issues. Simply stated, the value of precedent established elsewhere is limited. It certainly is not controlling.

> A different approach is normally desirable when an arbitrator is faced with a decision cited in a case involving the same parties, the same clause(s) and the same basic issue(s). In such cases, sound labor relations judgment requires that heavy weight be afforded to the earlier decision.

> My personal practice in such situations is to place great reliance upon the prior arbitrator's ruling. This is as it should be. Arbitrators, I believe, should be reluctant, when passing on a parallel case, to reach a contrary result if there is any sound basis for arriving at a consistent conclusion. Any other approach could have a serious, disturbing effect upon the parties. The value of maintaining stability in the

administration of the parties' collective bargaining agreement outweighs mild doubts about the wisdom of the earlier decision.

(R.R. at 1537a.) Arbitrator Aiges, thus relied on the principles set forth in the Dash and Reorganization I decisions in reaching his conclusion that the District had the authority to change the content of certain jobs. With respect to the Dash decision, Arbitrator Aiges wrote that Arbitrator Dash had "sought to balance two seemingly conflicting clauses. In so doing, it is fair to say, he gave greater weight to the District's need for operational flexibility than the Federation's interest in protecting staffing standards." (R.R. at 1388a.) Arbitrator Aiges reasoned that, until the parties modify the relevant clauses of the Agreement, the principles set forth in the Dash and Benewitz decisions, "must still be deemed controlling." (R.R. at 1389a.)

■■■ Arbitrator Aiges' opinion in Reorganization II, thus, reflects the prevailing view that although prior arbitration awards do not have the precedential value of judicial decisions, when the prior decision involves the interpretation of the identical contract provision(s) between the same parties, stability in collective bargaining relations requires acceptance by an arbitrator of the previous interpretation. Elkouri & Elkouri, How Arbitration Works (4th ed. 1985). Accordingly, the authoritative force of an arbitrator's interpretation of a provision is strengthened when the contract is renegotiated without modification of the relevant provision. *Id.* There is general agreement that the refusal to apply an arbitrator's decision to a subsequent case of the same nature is justified, however, when the previous decision was clearly erroneous or when changed conditions call into question the continued application of the decision. *Id.*

In this case, the parties executed the present Agreement on September 7, 1992, after Reorganization I, without modification of the relevant clauses. Therefore, we believe that the parties implicitly incorporated into the Agreement the Reorganization I interpretation of the clauses, that past practice cannot prevent the District from exercising its unilateral

authority to change the content of certain jobs, which Arbitrator Aiges recognized in Reorganization II. The same contractual provisions and issue control in the case before us, thus warranting application of the prior interpretation, particularly when this Agreement provides that an arbitrator is without authority to make any decision contrary to the Agreement or applicable law, Article B–VIII, Section 2, 3c(i).

In this case, however, the arbitrator abruptly disregarded the interpretation of the Agreement set forth not only in his own prior decision but also in the decisions upon which he relied. The arbitrator did not question the validity of the prior decisions, but apparently attempted to distinguish them on manifestly invalid grounds. Therefore, we believe that his decision cannot be deemed to represent a legitimate, reasonable exercise of his authority. Accordingly, we reverse the order of the court of common pleas.[6]

## ORDER

AND NOW, this 1st day of December, 1994, the order of the Court of Common Pleas of Philadelphia County dated March 21, 1994 is hereby reversed.

NEWMAN, J., dissents.

---

6. We note that nothing in this decision is intended to affect in any manner the power of this Court or the right of the District to maintain the operational flexibility required to implement educational equality within the schools of Philadelphia, ordered by this court in *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 161 Pa.Commonwealth Ct. 658, 638 A.2d 304 (1994), or to require that appropriate provisions be made for "the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth" as required by Article 3 § 14 of the Pennsylvania Constitution.