# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Berks and Berks County   :
Prison Board,                           :
                Appellants   :
                                :
        v.                   :   No. 1199 C.D. 2020
                                :   SUBMITTED: October 29, 2021
Teamsters Local Union 429    :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge[1]
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**             **FILED: March 30, 2022**

        The County of Berks and Berks County Prison Board (collectively, the County) appeal from an order of the Court of Common Pleas of Berks County that denied the County's petition to vacate an Act 195[2] arbitration award sustaining the grievance of correctional officer (CO) Ronald James (Grievant). We affirm.

        The relevant background of this matter is as follows. In July 2018, Grievant was seated at a desk in the common hall of the prison's E-Unit when he observed an inmate attempting to cover the cell door window with a towel in violation of safety regulations. Grievant opened the cell door electronically from a

---

[1] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

[2] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301. Act 195, as it is commonly referred to, is the Public Employe Relations Act.

control panel so that he could direct the inmate to take down the towel. The inmate came out of his cell, became extremely agitated, and yelled "What, I can't put up a curtain?" (Nov. 21, 2019 Arb. Award at 1.) When Grievant replied "No, you can't[,]" the inmate began yelling obscenities. (*Id*.) As Grievant approached the inmate and repeatedly ordered him to return to his cell, the inmate continued to argue and yell profanities. (*Id*.) When Grievant came within a few feet of the inmate, Grievant removed pepper spray from his holster, shook it, and once again ordered the inmate to return to the cell. When the inmate refused, Grievant sprayed him. However, the spray was ineffective because the inmate had turned his head and covered his face with the towel. At that point, Grievant took the inmate down to the floor. With fellow CO Landis now assisting, the pair applied physical force in an attempt to subdue the inmate. The Arbitrator described the physical force as follows:

> The inmate was on the floor, with [] Grievant over his left side with [Grievant's] right leg over the inmate's left leg while [Grievant] was attempting to free the inmate's left arm to be handcuffed. CO Landis was on the right side of the inmate attempting to free [the inmate's] right arm so that [CO Landis] could apply his handcuffs. As [Grievant] was unable to free the inmate's hands from beneath him, [] Grievant proceeded to strike the inmate two times at the head and neck area with horizontal elbow strikes. [] Grievant then called for assistance. As [Grievant] and CO Landis were still unable to pull the inmate's arms out from under him and the inmate was still actively resisting and being combative, [] Grievant proceeded to administer four more strikes to the [inmate's] head and neck area. After [] Grievant administered the strikes, they were able to free the inmate's arms and place him in handcuffs. The two [COs] then held the inmate down to the floor until [seven] [COs] came to assist.

(*Id*. at 2-3.)

2

Following a review of the relevant reports and video evidence, the County determined that Grievant used an unjustified and excessive level of force exceeding that which was necessary to achieve the inmate's compliance. Consequently, the County cited Grievant for excessive use of force and violation of other County policies. (*Id.* at 3.) As the matter moved through the disciplinary process, Chief Deputy Warden Smith determined that a twenty-day disciplinary suspension was appropriate. (*Id.*) Subsequently, Teamsters Local Union 429 (the Union) filed a grievance. At the third step of the process, the County reduced the suspension to five days due to "Grievant's long tenure and generally good performance . . . ."[3] (*Id.*) After the Union grieved the five-day suspension, the matter proceeded to a hearing before the Arbitrator. The Arbitrator concluded that the County lacked just cause to impose the suspension, entering the following award:

> On the basis of the record as a whole and for the reasons discussed, the grievance is sustained. The County is directed to make [] Grievant whole for all losses sustained as a result of his suspension. [It is] also to remove all references of this disciplinary action from his personnel file.

(*Id.* at 16.)

In the County's petition to vacate the arbitration award, the County argued that the award does not draw its essence from the collective bargaining agreement (CBA) between the County Commissioners and the Union, it violates public policy, and it is contrary to law. (Dec. 20, 2019 Pet. to Vacate Arb. Award at 1-7.) The trial court denied the petition. The County raises the same three arguments before this Court.

---

[3] Grievant worked as a CO for eighteen years, with no disciplinary infractions for the last sixteen of those years. (Nov. 21, 2019 Arb. Award at 7.)

When reviewing arbitration awards under Act 195, this Court's role is one of deference. *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Assoc. (PSEA/NEA)*, 743 A.2d 405, 413 (Pa. 1999) (*Cheyney Univ.*). Recognizing the strong presumption that the legislature and the parties intended for an arbitrator to be the judge of disputes under a CBA, we review an arbitration award using the essence test. *Id.* Pursuant to the essence test, "if the issue as properly defined falls within the scope of the parties' CBA, the arbitration award may only be vacated if the award 'indisputably and genuinely is without foundation in, or fails to logically flow from,' the CBA." *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334, 337 n.3 (Pa. Cmwlth. 2017) (citation omitted). If the essence test is met, then the award can be vacated only if it satisfies the narrow public policy exception, which means that the award's enforcement would contravene a well-defined and dominant public policy. *Shamokin Area Sch. Dist. v. Am. Fed'n of State, Cnty., & Mun. Emps. Dist. Council 86*, 20 A.3d 579, 582 (Pa. Cmwlth. 2011). In making these determinations, we are bound by the arbitrator's findings of fact. *Blairsville-Saltsburg Sch. Dist. v. Blairsville-Saltsburg Educ. Ass'n*, 102 A.3d 1049, 1050 (Pa. Cmwlth. 2014).

## I.

We first consider whether the Act 195 arbitration award draws its essence from the CBA. In addressing the first prong of the essence test, whether the issue as properly defined is within the terms of the CBA, we note that the issue as stated by the Arbitrator was "whether the County had just cause to impose a [five]-day disciplinary suspension on [] Grievant, and, if not, what shall the remedy be?" (Nov. 21, 2019 Arb. Award at 9.) The CBA provides that "Employer shall not demote, suspend, discharge, or take any disciplinary action against an employee

4

without just cause." (Section 36.1 of the CBA at 37; Reproduced Record "R.R." at 50a.) Consequently, the issue is plainly encompassed within the CBA. However, the County maintains that the award does not satisfy the second prong of the essence test because the Arbitrator's interpretation cannot be rationally derived from the CBA where he allegedly failed to follow prior, binding awards involving factually similar situations and CBA provisions. *See Sch. Dist. of Phila. v. Phila. Fed'n of Teachers, Local 13*, 651 A.2d 1152 (Pa. Cmwlth. 1994) (arbitrator's award did not satisfy essence test where it contradicted prior decision involving same parties, controlling issue, and substantially similar clauses of the CBA). In support, the County cites two prior arbitration awards where grievances were denied.

In the 2011 award, the present Arbitrator determined that there was just cause for the discharge of a CO who initiated physical contact with an inmate and let a verbal altercation escalate into a physical altercation. During the incident, the CO was assigned to the day room with approximately forty-five inmates and observed the inmate in an inappropriate location on the second-floor tier. (2011 Arb. Award at 5; R.R. at 98a.) The CO told him to come down, go to his cell, and lock-in. As the CO approached the inmate, the CO continued to direct the inmate to lock-in and he continued to refuse. (*Id.*) The CO then attempted to use the "forward goose hold" as a means of physically escorting the inmate, which resulted in the CO bringing the resisting inmate to the floor. The Arbitrator credited evidence that the CO initiated the physical contact and that there was no need for him to have intensified the situation by physically engaging the inmate. (*Id.* at 30; R.R. at 123a.) "While there was no question that [the] inmate [] was less than responsive when the [CO] directed him to lock in, . . . [the inmate] was moving toward his cell, albeit in a circuitous path." (*Id.*) In addition, the Arbitrator considered the fact that the CO

was aware of proper procedures and yet chose to engage the inmate. Finally, the Arbitrator weighed the CO's disciplinary record during his relatively short tenure of four years. (*Id*. at 31; R.R. at 124a.)

In the 2017 award, a different arbitrator determined that there was just cause for the discharge of a CO who was accused of exercising excessive force against an inmate who approached the CO at lunchtime and inquired as to an afternoon medication dosage. (2017 Arb. Award at 3; R.R. at 131a.) After the CO confirmed with the medical department that no dose was scheduled, the CO directed the inmate to take his lunch tray and return to his cell. However, the inmate persisted with his inquiry, insisting that the medication was due. A videotape depicts the CO talking toward the inmate and then "emerging from behind his desk, approaching [the inmate], pinning him against the desk, and then punching [him] twice in the head and once in the stomach while attempting to wrestle him to the ground." (*Id*.) At that point, the CO called for backup. The well-established protocol was to call a supervisor before confronting an inmate who refused to lock in. (*Id*. at 9; R.R. at 137a.) The arbitrator found that the record "established persuasively that the [CO] had no reasonable basis to construe [the] [i]nmate's verbal perseveration, argumentative conduct, or dawdling in returning to his cell as predictive of any immediate physical confrontation." (*Id*. at 13; R.R. at 141a.) In addition, the arbitrator concluded that the CO "was culpable for his decision to grapple with [the inmate] in an attempt to subdue and handcuff him simply because [he] was not proceeding to take his food tray and return to his cell as quickly or quietly as the [CO] wanted." (*Id*. at 9; R.R. at 137a.) The arbitrator concluded that the CO of nineteen years signaled his incorrigibility

> by unambiguously announcing his intention to run his unit
> as he sees fit, rather than in accordance with . . . reasonable

6

rules and policies designed to maintain a reasonable balance between a [CO's] right to protect himself and his colleagues from harm and the [CO's] concurrent responsibility to control inmates other than by physical force unless a situation reasonably can be construed as imminently jeopardizing the [CO's] safety.

(*Id*. at 15; R.R. at 143a.)

As the trial court herein determined, the prior two awards are factually distinguishable such that they did not materially alter the meaning and purposes of the relevant provisions of the CBA. The 2011 award involved a CO initiating physical contact with a non-combative inmate who was slowly but circuitously moving toward his cell and unnecessarily exacerbating a verbal altercation into a physical one. Similarly, the 2017 award involved a CO who unnecessarily exacerbated a situation by initiating physical contract with an inmate who was dawdling in returning to his cell but did not exhibit behavior warranting immediate physical confrontation. The CO in the 2017 award even pinned the inmate against a desk and then punched him twice in the head and once in the stomach.

By way of contrast, the inmate here persisted in refusing to return to his cell despite Grievant's affording him numerous opportunities to do so. In addition, he remained belligerent and noncompliant even after Grievant deployed pepper spray and while resisting the COs' attempts to subdue and handcuff him. (Nov. 21, 2019 Arb. Award at 8.) In fact, the COs' attempts to gain control over the inmate's arms in order to handcuff him were futile because he kept his arms tucked beneath him and continued to attempt to rise from the floor such that the COs were prevented from immediately calling for backup. (*Id*.) In that regard, the Arbitrator credited the testimony of both COs present during the incident that they perceived a threatening situation. (*Id*. at 15.) "Grievant testified that based on the amount of

7

resistance the inmate was giving them while they were attempting to get him handcuffed, if he had gotten up, they were convinced that he would assault them." (*Id*. at 14.) Notably, once the inmate was cuffed, Grievant immediately ceased using any force and waited for the responding officers to arrive. (*Id*. at 8.) While we might have found differently, we are bound by the Arbitrator's findings and accordingly, we cannot say that the award is without foundation or that it does not logically flow from the CBA.

## II.

We next consider whether the arbitration award violates public policy. The three-step analysis for application of the public policy exception provides that the Court (1) identify the nature of the conduct leading to the discipline; (2) determine if that conduct implicates a well-defined and dominant public policy; and (3) determine if the award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the arbitrator's fact findings. *City of Bradford v. Teamsters Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011). Whether the award violates public policy is a question of law, subject to our plenary review. *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Employees, Dist. Council 33, Local 934*, 52 A.3d 1117, 1121 (Pa. 2012). As the party below asserting that the award contravened public policy, the County carried the burden of establishing that the award violated positive law. *Pa. Tpk. Comm'n v. Teamsters Local Union No. 250*, 948 A.2d 196, 207 (Pa. Cmwlth. 2008).

We turn to the first prong, identifying the nature of the conduct leading to the discipline. Here, the conduct was Grievant's alleged use of unjustified and excessive force exceeding that which was necessary to achieve the inmate's

compliance. However, the Arbitrator made binding findings of fact in determining that there was no just cause for the five-day suspension. Both COs involved in the incident testified that they considered the inmate to be an "active resister" and the Arbitrator credited their testimony that they perceived a threatening situation. (Nov. 21, 2019 Arb. Award at 14-16.) Consequently, the Arbitrator determined that the level of force was justified and not excessive given the fact that "[t]he [Standard Operating Procedures (SOPs)] state that each [Use of Force] situation is unique[,] and they also recognize that a threat is based on what the officer(s) perceives as a threat."[4] (*Id*. at 16.)

---

[4] The "force continuum" provision provides:

> Each situation is unique. When force is required, an employee is not required to start with the least amount of force (if this is not appropriate) nor progress "by steps" through the force continuum (if this is not appropriate). Conversely, employees are always expected to use the appropriate level of force.

(SOP 8:01(1)(e), Nov. 21, 2019 Arb. Award at 5.) The justification for the use of force and force options provision provides:

> a. Use of force by staff, against an inmate . . . is justified when acting staff reasonably believe such force is necessary to:
>
> °prevent death or injury to themselves or others;
>
> °prevent escape;
>
> °recapture an escapee;
>
> °to quell a disturbance;
>
> °protect property from damage or destruction;
>
> °effect compliance with rules, regulations and orders when other methods of control have proven insufficient; [and]
>
> °to assist in the administration of medical treatment, in accordance with procedure.

(SOP 8:01(1)(a), Nov. 21, 2019 Arb. Award at 4.)

9

The second prong requires the Court to determine whether the conduct implicates a well-defined public policy, as opposed to general considerations of supposed public interests. *Neshaminy Sch. Dist.*, 171 A.3d at 338. Indubitably, there is an important public policy interest in guarding against the mistreatment of incarcerated individuals. *See, e.g.*, *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (regardless of the prison officials' intent, their use of excessive force constitutes cruel and unusual punishment in violation of the Eighth Amendment, U.S. CONST. amend. VIII). Acknowledgement of this important policy is also evident from the County's SOPs providing that a use of force should not exceed the amount of force required to restrain an inmate, and that a CO should apply only the least amount of force reasonably necessary to achieve an authorized purpose and should only use force when other methods of control have proven insufficient. (SOPs 3.21 and 8:01, Nov. 21, 2019 Arb. Award at 4.)[5] Again, the binding facts as found by the Arbitrator do not establish that Grievant exceeded those boundaries.

The third prong requires the Court to determine whether the award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the arbitrator's fact findings. The question here, therefore, is whether the award poses an unacceptable risk that will undermine the public policy of guarding against the mistreatment of incarcerated individuals and cause the County to breach its lawful obligations or public duty. This inquiry encompasses "consideration of the particular circumstances of the case and any attendant aggravating or mitigating factors." *City of Bradford*, 25 A.3d at 415. As

---

[5] In pertinent part, SOP 3.21 provides: "Employees shall use only that amount of force required to accomplish their lawful duties, restore order or gain compliance to a lawful order." (SOP 3.21, Nov. 21, 2019 Arb. Award at 4.)

10

noted, the Arbitrator credited Grievant's testimony as to his perception of the inmate as an active resister and his view that the inmate's combativeness and level of resistance constituted a perceived threat to himself, and others of imminent assault had the inmate arisen before the COs were able to handcuff him. Consequently, the third prong is not met.

Accordingly, enforcement of the award does not violate the defined public policy of protecting inmates from mistreatment or excessive use of force.

For the above reasons, therefore, we affirm.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

11

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Berks and Berks County    :
Prison Board,    :
        Appellants    :
    :
        v.    :    No. 1199 C.D. 2020
    :
Teamsters Local Union 429    :

# **O R D E R**

AND NOW, this 30th day of March, 2022, the order of the Court of Common Pleas of Berks County is hereby AFFIRMED.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita