**CITY OF BRADFORD, Appellant**

v.

**TEAMSTERS LOCAL UNION NO. 110.**

Commonwealth Court of Pennsylvania.

Argued Nov. 10, 2010.

Decided June 23, 2011.

---

Michael A. Palombo, Pittsburgh, for appellant.

Ernest B. Orsatti, Pittsburgh, for appellee.

BEFORE: LEADBETTER, President Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge and BUTLER, Judge.

OPINION BY President Judge LEADBETTER.

The City of Bradford (City) appeals from the order of the Court of Common Pleas of McKean County, denying the City's petition to vacate an arbitration award that modified discipline imposed on City employee James Taylor from termination to a long-term suspension without back pay and benefits. Our 2006 decision in this case, which vacated the arbitration award, was reversed and remanded by our Supreme Court for reconsideration in light of its decision regarding the standard of review of arbitration awards under the Public Employe Relations Act [1] (PERA) in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA (Westmoreland I)*, 595 Pa. 648, 939 A.2d 855 (2007).

The underlying facts as found by the Arbitrator are not in dispute. The City discharged Taylor from his employment as a refuse collector based on a May 28, 2003, incident.[2] Taylor was working in his normal position, collecting garbage from curbside and placing it into the packer of a garbage truck, when he noticed a purse in an open garbage bag. Taylor did not retrieve the purse, but, as he put the garbage bag in the packer, it opened and a large sum of money spilled out. Taylor then pocketed this money. A co-worker observed Taylor and advised him to turn the purse in to his supervisor; Taylor did so, but kept the cash. After the supervisor contacted the police to report the found purse, the police investigated and determined that the purse, with $800 inside, had been reported stolen earlier in the day. The purse now contained only a few dollars, and the police questioned Taylor about the missing cash. Taylor initially denied taking any money; however, he later admitted he had taken $239, which he then surrendered to the police. Arbitrator's Opinion at 2–3, Reproduced Record (R.R.) at 58a–59a.

---

1. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

2. The Arbitrator's decision refers to a May 28, 2003, incident and this also is the date listed in the City's disciplinary report with respect to the offense. *See* Reproduced Record (R.R.) at 58a, 41a. However, the trial court states that the incident occurred on May 23, 2003. Trial Court Opinion at 1, City's brief at Appendix A. Although we point out the discrepancy, we recognize that it has no effect on the outcome here.

On May 29, 2003, the City issued a disciplinary report, charging Taylor with violating Articles 13, 26 and 27 of the City's Standard Schedule of Disciplinary Offenses and Penalties (Disciplinary Schedule)[3] and suspending Taylor indefinitely pending the City's final decision on the matter. R.R. at 40a. Following a hearing, the City determined that Taylor committed the offenses with which he was charged and, by letter dated June 10, 2003, dismissed Taylor from his position. Thereafter, Teamsters Local Union No. 110 (Union) grieved Taylor's termination pursuant to the collective bargaining agreement (CBA) between the City and the Union, and the matter ultimately proceeded to arbitration.

The parties submitted to the Arbitrator the question of whether the City had "just cause" to terminate Taylor's employment,[4] and, if not, what the remedy should be. Arbitrator's Opinion at 1, R.R. at 57a. The CBA does not define "just cause," but it does incorporate the Disciplinary Sched-

ule, which provides for a range of discipline for each employee offense, including theft.[5] Based upon these provisions in the CBA, and the holding in *Office of the Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO*, 577 Pa. 257, 844 A.2d 1217 (2004),[6] the Arbitrator concluded that he had the authority to determine what constitutes just cause for termination as well as the appropriateness of the penalty imposed, within the parameters set forth in the Disciplinary Schedule. Arbitrator's Opinion at 5–6, R.R. at 61a–62a.

The Arbitrator concluded that the record did not support two of the charges against Taylor, but that, by taking the money, Taylor did engage in theft,[7] thereby violating Article 26 of the Disciplinary Schedule. In considering whether Taylor's discharge was the appropriate penalty under the circumstances, the Arbitrator observed that the CBA reflected the parties' agreement that dismissal is not mandatory for a first-time violation of Article

---

3. The City's Disciplinary Schedule is a non-exhaustive list of offenses with a corresponding range of penalties. R.R. at 42a. Article 13 prohibits "[u]nauthorized possession of . . . property of others;" Article 26 prohibits "[a]ctual or attempted theft of . . . the property of others;" and Article 27 prohibits "[i]mmoral, indecent, or notoriously disgraceful conduct unbecoming a City employee." *Id.* at 43a–44a.

4. Article XV, Section 1 of the CBA provides that "[t]he Employer shall not discharge nor suspend any employee without just cause." *Id.* at 32a.

5. Article XV, Section 2 of the CBA specifically incorporates the Disciplinary Schedule into the CBA and provides that the Disciplinary Schedule shall apply with respect to discharge and suspension. *Id.* at 33a.

6. In *Office of the Attorney General,* our Supreme Court considered whether an arbitrator had authority under the parties' CBA to reduce the discipline imposed by the employer once it was determined that the employee

committed the offense for which he was terminated. In resolving the issue, the Court concluded that, "[b]y failing to agree upon and incorporate a definition of just cause into the [CBA], and by casting the arbitrator into the role of resolving disputes arising under the [CBA] . . . the parties intended for the arbitrator to have the authority to interpret the terms of the agreement, including the undefined term 'just cause' and to determine whether there was just cause for discharge in this particular case." *Id.* at 269, 844 A.2d at 1224. The Court recognized that there is a consensus among arbitrators regarding the factors that may be considered in evaluating the appropriateness of the penalty imposed and accepted the concept that, where the parties' agreement did not dictate otherwise, arbitrators have the authority to reduce a penalty if that penalty is too severe due to mitigating circumstances. *Id.*

7. Taylor subsequently pled guilty to that offense.

26[8] and that "[w]hether or not restitution was made should enter into the determination of the penalty for the offense." R.R. at 46a. The Arbitrator interpreted these CBA provisions as follows:

[T]he Parties in this matter have recognized that extenuating circumstances sometimes exist and that discharge is not always the appropriate response. In the Disciplinary Schedule incorporated into the [CBA], the Parties have agreed that the discipline to be imposed for a first-time violation of Article 26 can range from a reprimand to removal. They also agreed "whether or not restitution was made should enter the determination of the penalty for the offense." With this negotiated language, the Parties have effectively agreed that theft, in and of itself, is not necessarily grounds for removal. Rather, mitigating factors, including whether restitution was made, may be considered in determining the appropriate discipline to be imposed.

Arbitrator's Opinion at 7, R.R. at 63a.

The Arbitrator then found that the City failed to consider certain mitigating circumstances in this case, including Taylor's prior good work history, the fact that the incident was isolated and not likely to be repeated and, most importantly, the fact that Taylor made full, if belated, restitution of the money taken. In recognition of these mitigating factors, the Arbitrator concluded that discharge was too harsh a penalty; accordingly, he reduced the discharge to a long-term suspension, without back pay or benefits, to run until the receipt of the award.[9] Id. at 63a–64a.

On appeal by the City, the trial court determined that, while review of the Arbitrator's award was governed by the "essence test," it also required application of what was then known as the "core functions" exception to the essence test. This exception was based on the premise that a government employer cannot bargain away its power to fire for misconduct bearing directly upon the performance of its essential (i.e., "core") functions, thereby imposing a legal restriction on an arbitrator's interpretation as to what the parties meant by "just cause." See, e.g., Greene County v. Dist. 2, United Mine Workers of Am., 578 Pa. 347, 852 A.2d 299 (2004); City of Easton v. Am. Fed'n of State, County & Mun. Employees, AFL–CIO, 562 Pa. 438, 756 A.2d 1107 (2000). Concluding that garbage collection was a core function of the City, the trial court vacated the award and reinstated Taylor's discharge.

In affirming, this court also applied the "core functions" analysis and held that "a public employer does not have the authority to expressly bargain away its ability to terminate an employee whose conduct hampers the employer's performance of its duties or its ability to insure the health, safety and welfare of its citizens, and any such provision in a CBA cannot be given effect." City of Bradford v. Teamsters Local Union No. 110, 901 A.2d 1103, 1112 (Pa.Cmwlth.2006), rev'd, 596 Pa. 353, 943 A.2d 263 (2008). Thereafter, the Union petitioned for allowance of appeal, and, by order dated March 26, 2008, our Supreme Court granted the Union's petition, re-

---

8. According to the Disciplinary Schedule incorporated into the CBA, the penalties for a first-time violation of Article 26 range from reprimand to removal; a second violation requires discipline ranging from a fifteen-day suspension to removal; and a third violation requires removal of the offending employee. R.R. at 46a.

9. According to the trial court, this meant that Taylor received a ten-month suspension. Trial Court Opinion at 4, City's brief at Appendix A. However, Taylor actually was suspended for thirteen months as a result of the Arbitrator's award; the suspension started May 29, 2003, and ended June 24, 2004, the date of the Arbitrator's award.

versed our order and remanded with instructions to reconsider the matter in light of *Westmoreland I*. On remand, common pleas sustained the arbitrator's award under the new standard.

In *Westmoreland I*, our Supreme Court reaffirmed that the proper standard to be employed by courts in reviewing grievance arbitration awards under PERA is the highly circumscribed "essence test," as articulated in *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999). However, the Court determined that the previously applied "core functions" exception to the essence test was insufficiently precise and prone to unwarranted expansion. Thus, the Court expressly rejected it. In its place, the Court recognized and adopted the narrow public policy exception to the essence test similar to that applied in federal courts. Specifically, the Court stated that an arbitrator's award will be upheld under the highly deferential essence test unless it contravenes public policy.

When this case was heard on remand before the trial court, the City argued that the Arbitrator's award could not be upheld because it violated the Commonwealth's well-defined public policy against theft.[10] However, the trial court rejected this argument on the grounds that: Taylor's position as a garbage collector did not place him in a position of trust; the CBA specifically provides that an act of theft does not automatically require termination; and, the CBA further directs that mitigating factors should be considered in deciding the appropriate penalty for theft. Accordingly, the trial court refused to vacate the arbitration award. The City now petitions this court for review of that order. As our Supreme Court remanded with instructions to consider in light of *Westmoreland I*, we now more closely examine the holding in that case.

In *Westmoreland I*, Sherie Vrable, a Classroom Assistant in a special education classroom, had been dismissed after overdosing at school on Fentanyl, a narcotic pain medication for which she did not have a prescription. Vrable's union disputed the firing, and an arbitrator reversed, finding no just cause for dismissal. The court of common pleas reversed the arbitrator, and this court affirmed. At the time, the standard for review of arbitration awards under a collective bargaining agreement was to apply the essence test, subject to the core functions exception.

The essence test examines whether "in rendering an award, the arbitrator's interpretation can rationally be derived from the collective bargaining agreement."[11] *Westmoreland I*, 595 Pa. at 657, 939 A.2d at 860. However, even if an award passed the essence test, it could still be vacated under the core functions exception. This exception had been established by our Supreme Court in *City of Easton*, which explained that a public employer, "by entering into the [CBA] at issue, did not and could not relinquish those powers which were essential to its ability to properly discharge its various functions, including the power to terminate those employees who steal from the City itself, or steal

---

10. The City noted that, subsequent to the arbitration, Taylor had been convicted of theft under Section 3921(a) of the Crimes Code, 18 Pa.C.S. § 3921(a).

11. The essence test also incorporates a review as to whether the decision was erroneous as a matter of law, under an analysis similar to that a trial court would undertake in deciding whether to render judgment notwithstanding the verdict. *See Indiana Area Sch. Dist. v. Indiana Area Educ. Ass'n*, 917 A.2d 366 (Pa. Cmwlth.2007).

from others while working for the City." 562 Pa. at 446–47, 756 A.2d at 1111. This court affirmed common pleas in *Westmoreland I* because it found that the arbitrator's award impacted the school's ability to discharge its core function of educating children.

Our Supreme Court reversed. The Court began its analysis by noting that the clear intent of the legislature in enacting PERA was to favor resolution of labor disputes by binding arbitration. To effectuate this goal, judicial review of arbitration awards must necessarily be limited in scope. The Court reaffirmed that the essence test is consistent with the goals of PERA because it is deferential and does not reach the merits of the arbitrator's decision. However, the Court criticized the core functions exception as exceptionally broad. Our Supreme Court, citing Judge Pellegrini's dissenting opinion before this court, opined that the core functions exception risked swallowing the essence test. The Court concluded that "the core functions exception is insufficiently precise, and raises serious questions regarding the jurisdiction to utilize arbitration as well as concerns regarding the potentially limitless reach of the exception." *Westmoreland I*, 595 Pa. at 665, 939 A.2d at 865. Thus, the Court concluded that the core functions exception was inappropriate, and replaced it with a new exception.

In place of the core functions exception, our Supreme Court fashioned a public policy exception to the essence test. Thus, under the new test, an arbitration award will be upheld if it can rationally be derived from the collective bargaining agreement, unless it contravenes public policy. "Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 666, 939 A.2d at 866.

Our Supreme Court noted that this standard has roots in both Pennsylvania contract law and federal law governing labor arbitrations. *See Westmoreland I* [referring to *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006 (1998) ]. Of note, however, is that these cases dealt with private contracts and private employers. Public policy, in relation to public employment, is different from public policy as it relates to private employment relationships. Unlike private employers, who are primarily concerned with the success of their own companies and resources, public employers and employees alike, both the supervisors who make disciplinary decisions and those disciplined, ultimately owe their duty of fidelity to the citizens of their respective jurisdictions and, therefore, must act with concern for both the citizens' welfare and the public fisc. This was the conceptual underpinning for the statement in *City of Easton* that public employers lacked the authority to bargain away their right to fire a thief, even though private employers undoubtedly have no such limitation. It bears noting that although the core function test has been superceded, *City of Easton* itself has not been expressly overruled, and the underlying principle of duty to the public must play a role in our application of the new public policy exception. Notwithstanding this difference, however, we believe the reference to federal precedent is significant in informing our understanding of the new public policy exception, in that federal caselaw looks to the policy implications of the arbitration award rather than the conduct of the grievant.

After our Supreme Court's decision in *Westmoreland I*, we have decided a number of cases involving the public policy exception. In several, we have found that enforcement of the arbitration award would violate public policy. In *Westmoreland* itself, this court, on remand, vacated the arbitrator's award reinstating the classroom assistant, concluding that the arbitrator's decision violated "a well-defined, dominant public policy to protect school children from illegal drugs and drug use." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Personnel Assoc., PSEA–NEA*, 977 A.2d 1205, 1211–12 (Pa.Cmwlth.2009). Additionally, in *Philadelphia Housing Authority v. American Federation of State, County & Municipal Employees*, 956 A.2d 477 (Pa.Cmwlth.2008), *petition for appeal granted* 601 Pa. 313, 972 A.2d 482 (2009), we found that an arbitrator's award reinstating an employee who had committed egregious sexual harassment against a co-worker violated the clear public policy against workplace sexual harassment. More recently, we have found that a public policy against violence in schools exists, but that it was not implicated when a school employee berated a supervisor over the telephone, outside the presence of students. *Shamokin Area Sch. Dist. v. Am. Fed'n of State, County & Mun. Employees Dist. Council 86*, 20 A.3d 579 (Pa.Cmwlth. 2011). However, in a number of cases where dismissal was for violation of work rules and procedures, we have affirmed arbitrators' awards of reinstatement. *See County of Monroe v. Teamsters Local 229*, 948 A.2d 894 (Pa.Cmwlth.2008); *County of Mercer v. Teamsters Local 250*, 946 A.2d 174 (Pa.Cmwlth.2008); *Pennsylvania Turnpike Comm'n v. Teamsters Local Union No. 250*, 948 A.2d 196 (Pa.Cmwlth. 2008).

In our view, application of the public policy exception requires a three step analysis. First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I*, 595 Pa. at 666, 939 A.2d at 866. Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.[12]

Applying this framework to the facts of the case at bar,[13] we first identify the nature of the conduct leading to the discipline, which was found by the arbitrator to be theft. Next, we see little room for doubt that on-the-job theft by a public employee implicates a well-defined, dominant, public policy. Theft is, of course, illegal, under Section 3921(a) of the Crimes Code, 18 Pa.C.S. § 3921(a). In addition, the text of PERA explicitly states that the public policy behind the statute is to create orderly and constructive relationships between employers and employees, "subject,

12. Obviously, this test relates to the usual cases in which an arbitrator has reduced a discipline imposed by the public employer, ordinarily reinstatement following a termination, based upon the arbitrator's interpretation of the "just cause" provision in the CBA. It would appear that there may be other types of arbitration awards which arguably violate a public policy, but that question is not presented here.

13. Here, it is undisputed that the essence test has been met, so it will not be discussed further. The only issue before the court is the public policy exception.

however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare." Section 101 of PERA, 43 P.S. § 1101.101. Theft from a member of the public by a public employee undermines the safety and welfare of the citizens of the Commonwealth.

In addition, there have been a number of judicial decisions holding that theft is just cause for firing a public employee. In *City of Easton*, the Supreme Court held that a public employer had just cause to terminate an employee who had stolen from the employer or "from a third party while he was working in the employ of the [c]ity." 562 Pa. at 448, 756 A.2d at 1112. *City of Easton* reiterated the Supreme Court's earlier holdings in this area of law. *See, e.g., Liquor Control Bd. v. Indep. State Stores Union*, 520 Pa. 266, 553 A.2d 948 (1989) (holding that the Liquor Control Board had just cause to discharge an employee who falsified records and misappropriated funds); *Phila. Hous. Auth. v. Union of Security Officers No. 1*, 500 Pa. 213, 455 A.2d 625 (1983) (holding that housing authority had just cause to discharge employee who defrauded elderly housing project tenant). These cases were admittedly decided under now-overruled standards, and not under the current public policy exception, but while the various analytical frameworks they applied have now been discredited, the underlying principle remains that there is a clear public policy against theft, and, more specifically, a public policy against the employment of thieves by the public.

Nonetheless, the analytical paradigms employed in these cases were rejected by our Supreme Court as overbroad and insufficiently deferential to the arbitrator's findings and judgment. We conclude that the difficulty with tests such as the "manifestly unreasonable" or "core function," in addition to the broad discretion accorded the courts in determination of policy, was that they lacked the third prong of the test described above, which focuses on the award of the arbitrator rather than on the behavior of the grievant. These earlier tests generally examined the conduct at issue to determine whether it was acceptable in a public employment setting. This led to viewing the conduct in a categorical or abstract way that placed little, if any, weight on the particular facts of the case. Certainly no theft, no sexual or racial harassment, no ill treatment of prisoners, however slight, can be said to be permissible.

The public policy exception, however, requires a further step and makes the third prong of the analysis ultimately determinative: Does the arbitrator's award pose an unacceptable risk that a clear public policy will be undermined if the award is implemented? This question allows for consideration of the particular circumstances of the case and any attendant aggravating or mitigating factors. In short, the three prong test to determine the public policy exception draws the necessary balance between the public employer's duty to protect the health, safety and welfare of the citizens it serves, the fair treatment of public employees and the salutary goal of PERA to insure the prompt resolution of labor disputes in binding arbitration.

The arbitrator in this case found several mitigating factors, including Taylor's prior good work history, the fact that the incident was isolated and not likely to be repeated and that Taylor made full, if belated, restitution of the money taken. Additionally, as common pleas noted, Taylor's job as a garbage collector did not put him in a position of trust with respect to the City's or residents' property. Finally, Taylor's crime was not planned, but rather opportunistic and he stole from a bag

found in the trash, not in someone's possession or on someone's property.

For these reasons, we conclude that the arbitrator's award, reducing the discipline from termination to a lengthy suspension without pay, does not pose a significant risk of undermining the public policy against theft or the City's ability to faithfully serve its citizens. Therefore, we affirm.

### ORDER

AND NOW, this 23rd day of June, 2011, the order of the Court of Common Pleas of McKean County in the above-captioned matter is hereby AFFIRMED.

DISSENTING OPINION BY Judge LEAVITT.

The majority concludes that under our Supreme Court's newly established "public policy exception" to the essence test, a public employer can be forced to reinstate an employee who is convicted for committing theft on the job. In so doing, the majority reaches a conclusion exactly opposite that reached by this Court under the so-called "core functions" exception to the essence test.[1] I believe that under either test, a public employer cannot bargain away its authority to discharge an employee who has committed theft on the job.

A public employer must retain the exclusive authority to decide whether, and when, to terminate a public employee who has committed an act of theft while working in a public service job. This point has been made by the Supreme Court on several occasions. In *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO, Local 447*, 562 Pa. 438, 448, 756 A.2d 1107, 1112

(2000), the Supreme Court held that a public employer "cannot bargain away its right" to discharge an employee who has stolen from the employer or "from a third party while he was working in the employ of the [c]ity." *City of Easton* reiterated the Supreme Court's earlier holdings in this area of law. *See, e.g., Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 362, 852 A.2d 299, 308 (2004) (noting that "[u]nlike private sector employers, public employers are ultimately responsible for the health, safety, and welfare of our communities."); *Pennsylvania Liquor Control Board v. Independent State Stores Union*, 520 Pa. 266, 553 A.2d 948 (1989) (holding that the Liquor Control Board did not bargain away its right to discharge an employee who falsified records). *City of Easton, Greene County* and *Pennsylvania Liquor Control Board* all predate the establishment of the public policy exception in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855 (2007) (*Westmoreland I*). *Westmoreland I* did not render this precedent irrelevant, a point acknowledged by the majority.

The majority holds that

> the underlying principle remains that there is a clear public policy against theft, and, more specifically, a public policy against the employment of thieves by [public employers].

*City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 415 (Pa.Cmwlth. 2011). Nevertheless, the majority believes that Taylor, convicted of theft committed in the course of his work for a public employer, can be reinstated, reasoning

---

1. *See City of Bradford v. Teamsters Union No. 110*, 901 A.2d 1103 (Pa.Cmwlth.2006), reversed, 596 Pa. 353, 943 A.2d 263 (2008) (*City of Bradford I*).

that the public policy test focuses not upon the public employee's conduct but, rather, upon the award itself. Only if a reinstatement poses an "unacceptable risk that a clear public policy will be undermined if the award is implemented" will it be vacated under the public policy exception. *Id.* at 415. It follows, according to the majority, that the arbitrator can consider "the particular circumstances of the case and any attendant aggravating or mitigating factors." *Id.* at 415. I disagree with this précis of the public policy exception to the essence test.

By directing a review of mitigating factors, the focus *is* on the conduct of the employee, not the award, notwithstanding the majority's assertion to the contrary. A consideration of mitigating factors undermines the public policy against employment of thieves because it obligates the public employer to excuse some acts of theft committed by employees who do not hold a position of "trust." There is no precedent, whether *Greene, Easton* or *Westmoreland,* to suggest that the public employee must be in a position of trust, whatever that means, in order for the public policy exception to the essence test to be implicated.

Evaluating an arbitration award according to the "particular circumstances" of the public employee's act of theft, or other act that violates a well-defined, dominant public policy, eviscerates the public policy exception.

First, "particular circumstances" is no test at all. It places no meaningful limit on the arbitrator's discretion, who can be guided solely by sympathy. Indeed, Taylor does present a sympathetic case. His impulsive act to seize what looked like abandoned property does not even seem very criminal. Had I been in charge of human resources for the City of Bradford, I might have recommended a discipline

other than discharge. However, the public policy exception confers the choice of discipline solely upon the public employer. *City of Easton,* 562 Pa. at 447–48, 756 A.2d at 1112.

Second, a "particular circumstances" review focuses on what seems fair to the individual employee and not on the needs of the public employer. The City of Bradford believes that Taylor's discharge was necessary to maintain discipline among its work force and to fulfill its duty to the public. Taylor's reinstatement means that the City must tolerate some acts of theft and that it will be forced to bargain away its discretion in this regard. It is for the public employer, and not an arbitrator or this Court, to decide whether a public employee who commits theft can be reinstated.

It has been well established that a public employer cannot bargain away its right to terminate an employee who has committed an on-the-job theft, and I do not believe the new public policy exception altered this principle. The arbitrator's award granting reinstatement to Taylor contravened that public policy, requiring that the arbitrator's award be vacated.

Accordingly, I would reverse the order of the trial court and vacate the Arbitrator's award as violating public policy.

Judge BROBSON joins in this dissenting opinion.