IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lehigh and Northampton        :
Transportation Authority,       :
                                 :
              Appellant   :
                                 :
            v.             :  No. 49 C.D. 2024
                               :  Argued:  September 9, 2024
Amalgamated Transit Union,   :
Local 956                   :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY JUDGE WOJCIK            FILED:  April 11, 2025

Lehigh and Northampton Transportation Authority (LANTA) appeals from an order of the Court of Common Pleas of Lehigh County (trial court), which affirmed the arbitration award issued by William W. Lowe (Arbitrator) in favor of Amalgamated Transit Union, Local 956 (Union).  The Arbitrator found that LANTA did not have just cause when it terminated Eric Gurner (Grievant) for his harassment of a security guard (T.F.[1]).  Instead, the Arbitrator expunged Grievant's termination in favor of a 10-day suspension, while reinstating Grievant to his former job and making him whole for any lost wages, benefits, or seniority.  On appeal, LANTA

_____

[1] For her privacy, the security guard will only be identified as T.F.  Any mention of her name in the decisions below have been edited to reflect this concern.  For consistency, any further mention of Grievant's last name has also been edited.

argues, *inter alia*, that the Arbitrator's decision contravenes Pennsylvania's public policy against sexual harassment. Upon careful review, we are constrained to affirm.

## I. Background

Based on the facts as determined by the Arbitrator, the trial court summarized the background as follows:

> LANTA operates a transit center in Allentown known as the "Allentown Transportation Center."
>
> T.F. worked as a security guard at the Allentown Transportation Center. Prior to working as a security guard, T.F. suffered a knee injury while serving in the military. T.F. had limited mobility because she was wearing a knee brace and using crutches and was restricted to working in the breakroom. Drivers, including Grievant, used the breakroom in which T.F. worked as a security guard.
>
> LANTA maintained an Anti-Harassment Policy. Grievant received the Anti-Harassment Policy and acknowledged the contents of the policy. In addition, Grievant received anti-harassment training when he was initially hired and during his five-year employment tenure.
>
> T.F. first encountered Grievant in May 2022. Grievant began to engage in conduct that made T.F. feel uncomfortable. On one occasion, Grievant grabbed at T.F.'s cane in a joking manner and inadvertently touched her knee in a non-sexual manner. T.F. told Grievant not [to] touch her cane or her personal belongings. In addition, Grievant began to question T.F. about her personal life.[2] Grievant told T.F. that he found it hard to believe that she was single, and asked T.F. when she was

_____

[2] The Arbitrator's Award indicates that Grievant asked T.F. if she lived alone or with family and whether she preferred older men, while expressing his disbelief that she could be single because she was so beautiful. Arbitrator's Award, 8/1/23, at 3. The Arbitrator's Award is contained in the Reproduced Record at 37a-62a.

2

going to let him take her out on a date. When T.F. did not respond, Grievant asked: "What's wrong? Do I look old enough to be your father?" T.F. did not understand why Grievant, a significantly older man, would continue to ask her out when she continued to say no to his entreaties.

During the same week that Grievant asked T.F. out on a date, Grievant, in the presence of T.F.'s supervisor . . . asked T.F. if he could massage her knee, and when she declined, offered to pay for a massage at another location. [T.F.'s Supervisor] later spoke to Grievant and told him that his behavior was creepy and weird.

One of T.F.'s co-workers . . . spoke to Grievant about his behavior to T.F. Grievant told [T.F's co-worker] that T.F. was being a "racist" and referred to her as a "bitch."

T.F. began to go into the bathroom to avoid dealing with Grievant[] and would ask a co-worker to text her when Grievant had left. Grievant's presence made T.F. uncomfortable and interfered with her ability to perform her job.

On July 25, 2022, Grievant was driving a bus on which T.F. was a passenger. Grievant drove the bus fast and aggressively. Grievant drove over a curb and made multiple sharp turns. When T.F. yelled at Grievant to stop the bus so an elderly woman could exit the bus, Grievant called T.F. a "loud mouth."

Grievant was aware of LANTA's policy prohibiting harassment in the workplace. Grievant was not aware that T.F. found his statements and behavior unwelcome at the time the behavior was occurring. However, Grievant would have known that T.F. was uncomfortable . . . because T.F. would disappear into the bathroom whenever Grievant entered the break room.

Trial Court's Op., 1/12/24, at 2-3.[3] The Arbitrator also observed that in the weeks preceding the July 25, 2022 incident, Grievant's behavior became increasingly aggressive, and "[a]t about the same time, [Grievant] was asked to give his preference for his bus route assignment and he picked the route T.F. used to travel back and forth from her residence to the job site."[4] Arbitrator's Award at 4. Similarly, Grievant questioned T.F.'s co-worker concerning her ability to do her job and expressed his desire for T.F. to be fired. *Id*. at 5.

Eventually, having been encouraged by her supervisor and co-worker, T.F. filed a complaint against Grievant. Arbitrator's Award at 4-5. LANTA conducted a hearing on August 3, 2022, and reviewed the evidence before it. Arbitrator's Award at 6. In part, this included video footage of the July 25, 2022 incident, wherein Grievant called T.F. a "fucking whore" after she had exited the bus.[5] *Id*. For his part, Grievant denied ever asking to give T.F. a massage and claimed that it was T.F. who was actually harassing him. *Id.* LANTA provided Grievant additional time to produce evidence of his defense and his own harassment claim. *Id*.

By letter on August 17, 2022, LANTA informed Grievant that based on the hearing, its own investigation, and Grievant's own statement, he was being

---

[3] The Trial Court's opinion is contained in the Reproduced Record at 636a-50a.

[4] The Arbitrator did not make much of this fact: "The bus route picking process occurs periodically, and in this case occurred in early June not long after he met T.F. and before the mid-June timeframe when T.F. testified that she became uncomfortable with Grievant. Additionally, the bus route picking was never mentioned in T.F.'s complaint. Thus, I do not find it indicative of, or preparatory to, the harassment of T.F." Arbitrator's Award at 25.

[5] The Arbitrator found that this act of "venting" did not constitute harassment because Grievant was alone on the bus. Arbitrator's Award at 25.

discharged for harassment. Arbitrator's Award at 7-8. Following numerous internal appeals, LANTA upheld its termination. *Id.*

After referral to the American Arbitration Association, the Arbitrator held a hearing on April 25, 2023. The Arbitrator characterized the issue before him as: "Did [LANTA] have just cause for the discharge of bus driver, [Grievant]? If not, what shall the remedy be?" Arbitrator's Award at 9.

The Arbitrator reviewed the pertinent provisions of the Collective Bargaining Agreement (CBA)[6] and LANTA's Anti-Harassment Policy.[7] The Anti-Harassment Policy defined harassment as consisting of

> unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's status such as sex, color, race ancestor, religion, national origin, age, medical condition, disability, marital status, veteran status, or citizenship status. LANTA will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with a[n] individual's work performance, or that creates an intimidating, hostile, or offensive environment for employees, passengers, vendors, or others with whom LANTA has contact.

Reproduced Record (R.R) at 432a. Upon receiving an allegation of harassment, the policy required LANTA to conduct a prompt and thorough investigation. If the investigation revealed that harassment had occurred, LANTA was required to take "appropriate action" to end the harassment and to take appropriate disciplinary action, "up to and including termination." *Id.* at 433a. In no uncertain terms, LANTA described its Anti-Harassment Policy as a zero-tolerance policy. *Id.* at 434a.

---

[6] The CBA may be found in the Reproduced Record at 396a-428a.

[7] The Anti-Harassment Policy may be found in the Reproduced Record at 430a-38a.

The Anti-Harassment Policy defines sexual harassment as

> unwelcomed sexual advances, requests for sexual favors, and other physical, verbal or visual conduct based on sex constitutes sexual harassment when:
>
> > (1) Submission to the conduct is an explicit or implicit term of employment;
> >
> > (2) Submission to or rejection of the conduct is used as the basis for an employment decision;
> >
> > (3) The conduct has the purpose or effect or unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment for employees, passengers, vendors, or others.

R.R. at 435a. The Anti-Harassment Policy separately outlines the procedure for handling sexual harassment complaints, although it follows the same procedure. As above, employees who are determined to have engaged in sexual harassment risk discipline "up to and including discharge." *Id*. at 434a-35a.

Because of Grievant's comments towards T.F., and his attempt to grab her cane, the Arbitrator found that Grievant had *harassed* T.F. in violation of LANTA's Anti-Harassment Policy. *See* Arbitrator's Award at 19-20. The Arbitrator likewise acknowledged that the Anti-Harassment Policy had "a zero-tolerance policy for discrimination in any form." *Id*. at 20. Yet, the Arbitrator did not understand LANTA's zero-tolerance Anti-Harassment Policy to necessitate the termination of Grievant. *Id*. Specifically, the Arbitrator observed that the procedure for the policy only *required* LANTA to conduct a thorough investigation to determine if harassment had occurred and, if so, to "[t]ake appropriate action to end the harassment." *Id*. To the extent the policy addressed discipline, the policy

6

permitted a continuum of actions "*up to and including* termination." *Id*. (emphasis added). Thus, the Arbitrator found that although the Anti-Harassment Policy explicitly permitted termination for an offense, it did not in fact *require*, but merely *permitted*, termination. *Id*.

The Arbitrator also acknowledged LANTA's post-hearing briefing which argued that failure to enforce harassment rules would violate Pennsylvania and federal law and that termination was proper here due to the public policy exception to the essence test. However, the Arbitrator opined:

> I would agree that a failure to enforce harassment rules is a major violation; however, the manner in which the rules are enforced – whether with a warning, a written reprimand, a short- or long-term suspension or termination – is determined by the egregiousness and severity of the violation. Not every violation warrants an immediate discharge even when a zero-tolerance policy is in effect. . . . . It has options that run the gamut as indicated - "up to and including termination."

Arbitrator's Award at 24.

In considering the egregiousness and severity of Grievant's violation, the Arbitrator found several factors to militate against termination: (1) T.F., by her own testimony, did not believe Grievant grabbed for her cane in a sexual manner; (2) Grievant ceased grabbing T.F.'s cane upon her request; and (3) Grievant was not aware that his other actions were unwelcome until the time of the hearing. Arbitrator's Award at 26. The Arbitrator likewise considered LANTA's argument that permitting Grievant to return would be inappropriate in light of the public policy against sexual harassment. The Arbitrator reasoned that while T.F.'s co-contractors would likely wish to see Grievant terminated, other LANTA drivers would view terminating Grievant for a first offense, despite Grievant's otherwise clean

7

disciplinary record spanning over five years, as unjust. *Id*. at 25-26. The Arbitrator therefore resolved to make his decision "on the facts presented, not the feelings of the workforce." *Id*. Ultimately, the Arbitrator decided: "In this instance, I do not find that discharge/termination to be the appropriate disciplinary measure. Instead, based on his clear harassing comments and actions toward T.F., I find that the [10 day] suspension to be the appropriate discipline for Grievant's first offense of harassment in this case." *Id*. at 26-27.

On appeal, the trial court upheld the Arbitrator's Award. The trial court found that it was constrained to do so, in large part, because of the deference a reviewing court owes to an arbitrator's award. *See* Trial Court Op. at 3-4, 13. More particularly, the trial court had no difficulty determining that the Arbitrator's Award satisfied the essence test, reasoning that the CBA expressly contemplated the issue as described by the Arbitrator and that his award was rationally derived therefrom because of the policy's explicit reference to a continuum of discipline for harassment. *Id*. at 3-9.

Regarding the public policy exception, the trial court opined that LANTA was incorrect in relying on the test articulated in *City of Bradford v. Teamster Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011), as it was "superseded" by the Supreme Court's own test in *Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, 210 A.3d 993, 1011 (Pa. 2019).[8] Trial Court Op. at 11 n.5. As such, the trial court found

---

[8] The *Millcreek* test provides:

> First, a reviewing court must identify precisely what remedy the arbitrator imposed. . . . . Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal

**(Footnote continued on next page…)**

that "the crucial inquiry [was] whether, given the factual findings of the Arbitrator, a ten-day suspension in lieu of termination compel[led] LANTA to violate the public policy against sexual harassment." *Id*. at 11. In upholding the Arbitrator's Award, the trial court agreed with the Arbitrator that Grievant's conduct was highly inappropriate, but not egregious, and deferred to the Arbitrator's Award because of the public policy exception's narrow application. *Id*. at 12-13.

## II. Issues

Before this Court,[9] LANTA presents two issues for our review: (1) whether the trial court erred by concluding that the Arbitrator's Award satisfies the essence test; and (2) whether the trial court erred by holding that compliance with the Arbitrator's Award comports with this Commonwealth's public policy against sexual harassment.

## III. Discussion

### A. The Essence Test

Initially, as this Court has explained:

> precedence and not from general considerations of supposed public interest. . . . . Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Millcreek*, 210 A.3d at 1011 (internal quotations and citations omitted).

[9] This Court's scope of review is a "plenary, non-deferential standard where the resolution of the issues turns on a question of law or application of law to undisputed facts." *City of Philadelphia v. Fraternal Order of Police Lodge No. 5 (Jason Breary)*, 932 A.2d 274, 279 n.6 (Pa. Cmwlth. 2007).

9

The essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution. An arbitrator's award, however, must draw its essence from the [CBA]. Pursuant to the "essence test," an award should be upheld if (1) the issue as properly defined is within the terms of the [CBA], and (2) the arbitrator's award can be rationally derived from the [CBA]. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the [CBA].

*Rose Tree Media School District v. Rose Tree Media Secretaries and Educational Support Personnel Association-ESPA, PSEA-NEA*, 157 A.3d 558, 564-65 (Pa. Cmwlth. 2017) (internal citations omitted). Even where we disagree with an arbitrator's findings of fact, we may not second-guess or otherwise reject the finding. *Rose Tree Media Secretaries and Educational Support Personnel Association-ESPA, PSEA-NEA v. Rose Tree Media School District*, 136 A.3d 1069, 1078 (Pa. Cmwlth. 2016).

Similarly, regarding interpretation, the arbitrator is "not confined to the express terms of the agreement. Our court has stated that an arbitrator's award may draw its essence from the [CBA] if the arbitrator's 'interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.'" *Danville Area School District v. Danville Area Education Association, PSEA/NEA*, 754 A.2d 1255, 1260 (Pa. 2000). The essence test "does not permit an appellate court to intrude on the domain of the arbitrator and determine whether an award is 'manifestly unreasonable.'" *Northumberland County Commissioners v. American Federation of State, County and Municipal Employees, AFL-CIO Local 2016, Council 86*, 71 A.3d 367, 375 (Pa. Cmwlth. 2013) (internal citation omitted). (internal citations omitted). An appellate

court "must sustain the arbitrator's award if it is based on anything that can be gleaned as the 'essence' of the [CBA]." *Id.* (internal citations omitted).

In primary part, LANTA argues that the essence test has been abused by arbitrators who seek to substitute "clear policies negotiated between a union and its employer" in favor of an arbitrator's own judgment. LANTA's Brief at 21. In its view, upon finding that Grievant violated LANTA's Anti-Harassment Policy, the Arbitrator was required to uphold Grievant's termination. *Id.* at 23. In support thereof, LANTA directs our attention to *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees*, 52 A.3d 1117, 1127-28 (Pa. 2012), arguing that the Supreme Court's decision therein requires an arbitrator to uphold discipline after making a finding of harassment – or risk violating "the spirit and intent of employer's policy and public policy." LANTA's Brief at 24.

However, LANTA also argues that the Arbitrator misapplied the essence test. LANTA's Brief at 25. LANTA asserts that the CBA expressly contemplates a zero-tolerance policy with respect to weapons, and, as such, "[t]he Arbitrator's Award fails this point because the disciplinary steps involving harassment mandates termination for the first offense . . . [and] by ignoring the zero-tolerance aspect of the rules, the Arbitrator did not abide by the essence of the [CBA]." *Id*. at 29. Similarly, LANTA argues that its zero-tolerance policy is evidence of its past practice of termination for a first-offense violation of the Anti-Harassment Policy. *Id*. at 39 (citing *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 381 A.2d 849, 852 (Pa. 1977) (an arbitrator may use evidence of past practice as a tool in interpreting a CBA)).

11

The Union responds by arguing that LANTA never disputed that the issue before the Arbitrator was encompassed by the CBA, thus satisfying the first prong of the essence test. Union's Brief at 18. Regarding the second prong, the Union argues that the Arbitrator's application of the just cause standard can be rationally derived from the CBA. *Id.* The Union asserts that the Arbitrator's analysis properly evaluated whether the termination was supported by just cause by considering: Grievant's length of service; Grievant's otherwise clean disciplinary record; distinctions between which incidents actually amounted to harassment and those which did not; and LANTA's own *de minimis* violation of the CBA.[10] *Id.*

The Union similarly views LANTA's arguments pertaining to its past practices and whether violation of the Anti-Harassment Policy necessitates termination for a first offense as immaterial, because the Arbitrator's award satisfies the essence test. Union's Brief at 21. Even so, the Union reminds this Court that the Arbitrator squarely disagreed with LANTA's interpretation of the Anti-Harassment Policy and rejected the notion that LANTA had a past practice of terminating employees for a first offense. *Id.* Further, contrary to LANTA's suggestions otherwise, the Union reminds this Court that an arbitrator is permitted to alter or mitigate the chosen discipline. *Id.* at 24 (citing *County of Bedford v. Pennsylvania Social Services Union, SEIU, AFL-CIO, Local 668*, 814 A.2d 866, 870-71 (Pa. Cmwlth. 2003); *School District of Philadelphia v. Commonwealth Association of School Administrators, Teamsters Local 502*, 160 A.3d 928, 934 (Pa. Cmwlth. 2017); *Gateway School District v. Teamsters Local 205*, 181 A.3d 461, 464

---

[10] The Arbitrator concluded that LANTA violated the CBA by not informing Grievant of the nature of his charges until the August 3, 2022 hearing. However, the Arbitrator characterized this violation as *de minimis* because LANTA provided Grievant additional time to provide the names of witnesses to support his claims. Arbitrator's Award at 23.

(Pa. Cmwlth. 2018); *York County Prison v. Teamsters Local Union No. 776*, 245 A.3d 399, 406-08 (Pa. Cmwlth. 2021)).

We agree with the Union. Here, LANTA is attempting to evade our inevitable deference to the Arbitrator's findings of fact and interpretation of the CBA by suggesting that the Arbitrator's Award misapplied the terms of the zero-tolerance Anti-Harassment Policy. Employing the essence test here, LANTA does not dispute that the CBA encompasses the issue contemplated by the Arbitrator.[11] Regarding the second prong of the essence test, the Arbitrator's Award drew its essence from and was rationally derived from the CBA because LANTA's Anti-Harassment Policy explicitly contemplates a range of disciplinary measures for harassment offenses. Per the Anti-Harassment Policy's own terms, LANTA was simply required to conduct an investigation and undertake a course of action aimed at preventing further harassment. *See* R.R. at 436a-37a. Because of the Anti-Harassment Policy's express terms, the Arbitrator flatly rejected LANTA's belief that its zero-tolerance approach necessitated termination. As indicated above, we are bound by this interpretation. *See Danville Area School District*, 754 A.2d at 1260.

Further, although LANTA is correct that the Anti-Harassment Policy explicitly permitted termination for such an offense as Grievant's, we have repeatedly held that "in the absence of an express limitation in the CBA, an arbitrator resolving a labor dispute may modify the discipline imposed and hand down a lesser

---

[11] In any case, Article VII of the CBA permits LANTA to "publish disciplinary rules and safety regulations" and grants LANTA the right to "impose discipline for violation" of the same. R.R. at 415a-16a. Likewise, Article VII of the CBA requires that LANTA conduct an investigation to determine whether an employee's discipline was issued unjustly and to rectify the matter if so. *Id*. Because the Anti-Harassment Policy is a set of disciplinary rules, pursuant to which Grievant was disciplined, and LANTA has a duty to determine whether the discipline was just, the issue as articulated by the Arbitrator was clearly encompassed by the CBA.

discipline. To limit the authority of the arbitrator, the CBA must specifically define or designate the discipline to be imposed or state that the employer has sole discretion to determine the discipline." *Gateway School District*, 181 A.3d at 466. LANTA does not argue that the CBA and Anti-Harassment Policy contains any such limitation on the Arbitrator's authority, nor does a review of the same reveal any limitation. Likewise, although an arbitrator is permitted to use evidence of an employer's past practice as evidence, here, the Arbitrator rejected that LANTA had a past practice of terminating LANTA employees for violations of the Anti-Harassment Policy. *See* Arbitration Award at 24. Thus, because of the extreme deference we owe to the Arbitrator's findings of fact and interpretation of the CBA, LANTA's arguments on this point necessarily fail.

LANTA also appears to argue that the Supreme Court's decision in *Philadelphia Housing Authority* requires an arbitrator to blindly uphold an employer's termination of an employee for a sexual harassment violation as part of the essence test. However, by its own terms, *Philadelphia Housing Authority* first contemplated whether the arbitrator's award satisfied the essence test and then analyzed whether the public policy exception applied. *See Philadelphia Housing Authority*, 52 A.3d at 1117 ("Under [*Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855, 866 (Pa. 2007)], **if the essence test is satisfied**, we may consider further whether the award violates a well-defined and dominant public policy.") (emphasis added). As such, the impact of *Philadelphia Housing Authority* on the case at bar is more appropriately discussed below.

14

### B. The Public Policy Exception

The above-described essence test is itself a narrow exception to "the vast majority of cases, [in which] the arbitrator's decision shall be final and binding upon the parties." *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). This relative finality notwithstanding, "a reviewing court [can] nonetheless vacate an arbitrator's award that satisfies the essence test if (and only if) it violates a well-defined, dominant public policy as provided by reference to the laws and legal precedents and not from general consideration of supposed public interests." *Millcreek*, 210 A.3d at 1008 (quotations omitted). Still, this public policy exception is to be understood as "exceptionally narrow." *Westmoreland*, 939 A.2d at 868 (Saylor, J., concurring). In the context of employee discipline grievances,[12] we formulated the following three-step analysis:

---

[12] Here, LANTA argues that we must apply the *City of Bradford* test while the Union argues that we must apply the *Millcreek* test. *Cf.*, LANTA's Brief at 36; Union's Brief at 28. As indicated, the trial court applied the *Millcreek* test to the employee discipline grievance before us because it viewed the *Millcreek* test as "superseding" the *City of Bradford* test. *See* Trial Court Op. at 11 n.5.

However, this is not quite correct. In *Millcreek*, 210 A.3d at 1010-11, the Supreme Court recognized that the public policy exception has primarily developed in the context of employee discipline. The issue therein, however, involved a subcontracting grievance. *Id.* The High Court reasoned that the *City of Bradford* test was "ill-suited" to the grievance at issue because its "application risk[ed] inviting reviewing courts to take a broader view of the public policy exception than [their] cases permit[,]" thereby articulating its own test. *Id.* Even so, the Supreme Court did not "opin[e] on the suitability of the [*City of Bradford*] test in the employee discipline grievance context . . . ." *Id.* Thus, in this context, the test in *City of Bradford* remains viable.

Nevertheless, the trial court's misstatement of the law on this point is understandable. In fact, since the Supreme Court issued its decision in *Millcreek*, this Court has inconsistently relied **(Footnote continued on next page…)**

First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*City of Bradford*, 25 A.3d at 414.

LANTA argues that the Arbitrator's award violates the public policy exception to the essence test because its "essential public function" is to transport passengers, and that it has an attendant security obligation to ensure all employees, including vendors, have a safe work environment.[13] LANTA's Brief at 31-32. Therefore, LANTA believes it is imperative that it possess the ability to discipline those employees who run afoul of policies aimed at achieving this objective. *Id.* LANTA also argues that Grievant's reinstatement would "not only" undermine the

---

on both tests in this context. *See, e.g.*, *York County Prison v. Teamsters Local Union No. 776*, 245 A.3d 399, 409 (Pa. Cmwlth. 2021) (applying *City of Bradford*); *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 245 A.3d 333, 339 (Pa. Cmwlth. 2020) (applying *Millcreek*). Regardless, aside from the Supreme Court's concern that the *City of Bradford* test risks too broad a view of the public policy exception, there is little difference between the application of the two tests here. Because the grievance before us involves employee discipline, and because it remains good law, *City of Bradford* is applied in the matter *sub judice*.

In any case, given that *Millcreek* is somewhat stricter than *City of Bradford*, the *Millcreek* test would not, *a fortiori*, compel a different result here. The trial court's reliance on *Millcreek* therefore constitutes harmless error. *See, e.g.*, *Campbell v. Department of Environmental Resources*, 396 A.2d 870 (Pa. Cmwlth. 1979) ("It is axiomatic that we will not disturb a judgment, order, or decree on appeal for harmless error.").

[13] LANTA has failed to acknowledge that our Supreme Court abandoned the core functions test in *Westmoreland*, 939 A.2d at 865.

16

public policies discussed above, per the public policy exception as articulated in *City of Bradford*, but it would also "encourage other bad behavior from employees and third parties." *Id*. at 36.

In response, the Union does not believe that the narrow public policy exception to the essence test applies here and reminds us that we have been reluctant to apply this exception in the past. Union's Brief at 26 (citing, *e.g.*, *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 77*, 87 A.3d 904, 911-912 (Pa. Cmwlth. 2014)). Relying on the same, the Union asserts that there "is no public policy that mandates the discharge of all employees who are alleged to have committed misconduct or violated work rules." Union's Brief at 27. The Union concedes that "courts of this Commonwealth have recognized that avoiding sexual harassment in the workplace can render an arbitration award that otherwise satisfies the essence test contrary to a well-established public policy . . . ." *Id*. at 28.

Here, however, the Union believes that the Arbitrator's Award does not contravene this public policy, because despite Grievant's reinstatement, he was nevertheless subjected to a "significant disciplinary penalty." Union's Brief at 28. Critically, the Union asserts that the focus of our inquiry is on whether the employer's compliance with the award would violate public policy, not whether Grievant's conduct is contrary to public policy. *Id*. (citing *Rose Tree Media*, 136 A.3d at 1076). As such, the Union argues that LANTA's reliance on *Philadelphia Housing Authority*, 52 A.3d at 1117, is self-defeating, as the High Court's inquiry specifically seized on the employer's conformity with the award rather than the grievant's own egregious conduct. Union's Brief at 31. Hence, the Union does not view that decision as prohibiting an arbitrator from modifying an employer's

discipline or necessitating termination, so long as the award itself does not violate public policy. *Id.*

Here, neither LANTA nor the Union dispute the first two prongs of the *City of Bradford* test: the conduct at issue is Grievant's harassment of T.F., in violation of the well-defined, dominant public policy against sexual harassment as held in *Philadelphia Housing Authority*, 52 A.3d at 1127-28. Therein, our Supreme Court considered whether an arbitrator's award was precluded by the public policy exception in the context of sexual harassment. *Id.* at 1123, 1127-28. The award reinstated an employee following his termination for the "lewd, lascivious and extraordinarily perverse" verbal and physical sexual harassment of a co-worker, which the arbitrator believed was more appropriately disciplined by the employer's initial verbal reprimand, despite the arbitrator's recognition of the severity of the sexual harassment. *Id.* at 1119-20. In its analysis, the Supreme Court recognized the existence of an explicit, well-defined, and dominant public policy against workplace sexual harassment "grounded in both federal and state law against sex discrimination in employment, including Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(e)], the regulations of the [Federal Equal Opportunity Commission], and [the Pennsylvania Human Relations Act[14]]." *Id.* at 1123.

The Court ultimately vacated the arbitrator's award, while recognizing the tension between the deference that the courts owe to the award and our strong public policy against sexual harassment, observing:

> Although a labor arbitrator's decision is entitled to deference by a reviewing court, it is not entitled to a level of devotion that makes a mockery of the dominant public policy against sexual harassment. The award in this case encourages individuals who are so inclined to feel free to

---

[14] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§951-963.

18

> misbehave in egregious ways, without fear of any meaningful consequence. . . . . In our view, the rational way to approach the question is to recognize the relationship between the award and the conduct; and to require some reasonable, calibrated, defensible relationship between the conduct violating dominant public policy and the arbitrator's response.

*Philadelphia Housing Authority*, 52 A.3d at 1127-28. Additionally, the Court recognized that the deference we afford to an arbitrator's award cannot always overcome a public employer's interest in upholding its own anti-harassment policies: "Although we do not hold that termination was required under the circumstances here, we likewise reject the arbitrator and [the union's] counter-assertion that a public employer can be precluded from taking such decisive action against an employee following its investigation." *Id.* at 1124.

> Still, in a concurring opinion, former Justice Eakin counseled:

> I join the majority with the understanding the new public policy is limited to a public employer and egregious misconduct. . . . . Just as with any form of repugnant behavior, there are gradations of misconduct, and the consequences that flow from such behavior must likewise have gradations commensurate with the conduct. . . . . [W]hile any workplace sexual harassment is against public policy, we cannot sanction a preemptive requirement of dismissal in all cases, no matter the level of misconduct.

*Id*. at 1129 (Eakin, J., concurring).

However, here, although the Anti-Harassment Policy differentiates between harassment and sexual harassment, the Arbitrator concluded that Grievant's conduct only amounted to *harassment*. In fact, to the extent that the Arbitrator found that the sexual harassment provisions of the Anti-Harassment Policy might have been applicable – the cane incident – the Arbitrator found, based on T.F.'s testimony, that Grievant's conduct was not sexual. Thus, it is not clear to us that the well-

19

defined, dominant public policy against sexual harassment is implicated in this matter.

Indeed, in certain respects, the current matter bears a likeness to our prior decision in *Riverview School District v. Riverview Education Association* (Pa. Cmwlth., No. 144 C.D. 2018, filed July 12, 2021).[15] Therein, the grievant made a number of highly inappropriate romantic overtures to a fellow teacher over the span of a few years, including multiple gifts and an ill-advised love letter. Slip op. at 2-4. Upon reviewing the school district's policies and relevant state and federal law on the issue, the arbitrator concluded that, while inappropriate, the conduct did not amount to sexual harassment. *Id*. at 11. On appeal, we observed:

> Reviewing the record with reference to the [school district's] policy and relevant law, we note the absence of: unwelcome sexual advances; requests for sexual favors; sexually charged innuendo; suggestive or lewd remarks; horseplay of a sexual nature; or other inappropriate verbal, written, graphic or physical conduct *of a sexual nature*.
>
> Based on the [a]rbitrator's findings, the nature of [the g]rievant's conduct, while unquestionably inappropriate, is more akin to the expression of unrequited affection rather than sexual harassment as defined in policy or law. In light of the deferential standard of review stated by the Supreme Court in *Millcreek*, we are constrained to conclude that the [a]rbitrator's award does not contravene the public policy exception does not apply in this matter.

*Id*. at 25-26 (italics in original). Still, we reasoned that "even if sexual harassment as so defined had been established, the [arbitrator's award, a nine-month suspension

---

[15] Unreported memorandum opinions of this Court filed after January 15, 2008, may be cited for their persuasive value pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 126(b), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

20

without pay,] does not pose an unacceptable risk that will undermine the well-established public policy *given the particular circumstances at hand and the factual findings of the arbitrator*." *Id*. at 26 n.12 (italics in original; quotations and citations omitted).

Presently, given the Arbitrator's findings of fact, the particular circumstances of this case are as follows: although Grievant's conduct toward T.F. amounted to harassment, and that Grievant should have known his conduct was unwelcome, Grievant's conduct was not sexual according to T.F.'s own testimony. Thus, we cannot conclude that the instant case implicates either LANTA's policy against sexual harassment or the Commonwealth's public policy against the same.

Even if we held otherwise, we would not conclude that LANTA's compliance with Grievant's reinstatement would undermine this public policy. Here, as would be required by *Philadelphia Housing Authority*, the Arbitrator formulated a "reasonable, calibrated, defensible relationship" between reinstating Grievant after a 10-day suspension and his inappropriate, but non-egregious, behavior. The Arbitrator acknowledged that Grievant's conduct toward T.F. amounted to the harassment of T.F. and that Grievant should have known that his conduct was unwelcome because T.F. would purposefully go to the restroom when Grievant entered her workstation. However, the Arbitrator also weighed these considerations against militating circumstances: T.F.'s acknowledgement that Grievant did not grab for her cane in a sexual manner; that Grievant was unaware that his comments were unwelcome until the time of the hearing; and that Grievant ceased any unwelcome conduct when told to do so. The Arbitrator thereby found that the conduct was not so severe as initially alleged by LANTA and that it did not warrant termination. *See* Arbitrator's Award at 26.

21

The Arbitrator's Award makes clear that he placed particular import on Grievant's cessation of the harassment once notified. Arbitrator's Award at 26.[16] Similarly, while the Arbitrator rendered his decision on the facts presented as opposed to the views of T.F.'s fellow contractors or Grievant's fellow drivers, it also indicated that the Arbitrator was not blind to whether Grievant's reinstatement would be appropriate. Rather, his decision to modify LANTA's discipline contemplated the message that Grievant's return to the workforce would send to other employees and essentially whether the award would encourage future harassment and thus undermine public policy. Arbitrator's Award at 25-26.

By its own terms, *Philadelphia Housing Authority*, 52 A.3d at 1124, did not require termination under its egregious circumstances. It merely required a defensible relationship between the award and the conduct violating the public policy, on the facts as found by the Arbitrator.[17] While we may have issued different factual findings than the Arbitrator did here, or come to different conclusions regarding credibility, it is of no moment. We are "prohibited from second guessing" these findings of fact so long as the Arbitrator was "even arguably acting . . . within the scope of his authority[;]" *American Federation of State, County, and Municipal Employees, District Council 88, AFL-CIO v. City of Reading*, 568 A.2d 1352, 1356

---

[16] *Cf. Neshaminy School District v. Neshaminy Federation of Teachers*, 171 A.3d 334, 341-42 (Pa. Cmwlth. 2017) (finding an unacceptable risk of the public employer undermining public policy by reinstating a grievant from a suspension because there was no reasonable, calibrated, defensible relationship between the award and the grievant's *continuous*, sexually explicit, verbal harassment of his co-worker).

[17] Indeed, it appears that the Arbitrator attempted to comply with Justice Eakin's counsel by determining the proper gradation of discipline in relation to the severity of the conduct. *Philadelphia Housing Authority*, 52 A.3d at 1129 (Eakin, J., concurring).

(Pa. Cmwlth. 1990); nor may we undertake any independent factual analysis. *Rose Tree Media*, 136 A.3d at 1078.

Therefore, based upon the facts as found by the Arbitrator, we are constrained to conclude that the Arbitrator's Award does not undermine the Commonwealth's public policy against sexual harassment or LANTA's duty to the public.

## IV. Conclusion

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

Judge Dumas did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lehigh and Northampton Transportation Authority, | : | |
| | : | |
| | : | |
| Appellant | : | |
| | : | |
| v. | : No. 49 C.D. 2024 |
| | : | |
| Amalgamated Transit Union, Local 956 | : | |
| | : | |

# **O R D E R**

AND NOW, this 11th day of April, 2025, the Order of the Court of Common Pleas of Lehigh County dated January 12, 2024, is **AFFIRMED**.

_____
MICHAEL H. WOJCIK, Judge